RICHARDSON, Administrator, v. SMART et al., Appellants.

## Division One, December 12, 1899.

1. **Contract:** GIFT: INCAPACITY OF MAKER: TEMPORARY SICKNESS. In cases where the alleged incompetency of the maker of a contract or gift arises from temporary or sudden sickness resulting in inter-. mittent conditions of sanity and insanity, the usual presumption. that when the condition of the maker is once shown to exist it will be. *presumed to continue to exist until the contrary is shown,. has no* application. In such case the burden of proof is upon the party challenging the legality of the contract or gift to show that at the. time it was made such incompetency existed.

2. ———: DONOR AND DONEE: CONFIDENTIAL RELATION: HALF-SISTER. Where the donee was a half-sister of the donor, and they lived in. different cities, she did not stand in a confidential relation to him, although she was his favorite relative; and hence the burden of proof is not shifted to her to explain why, during his last sickness, he made the gift to her instead of to a married daughter by a wife from whom. he had long been divorced.

3. ———: ———: ———: UNCLE. Nor did such confidential relation exist between the deceased and his uncle in such a way as to cast the burden of proof on his half-sister to explain the gift to her, although the uncle drew up the assignment of the donated stock, and: the deceased had previously advised with him about business matters, and had borrowed money from him, pledging the stock as. surety, and had at other times left the stock in his custody.

4. ———: INCAPACITY OF MAKER: TYPHOID FEVER. Simply because one has typhoid fever and at interims, on the day he transferred certificates of stock to his half-sister and for a few days preceding, strongly manifested the intermittent delirium that usually accompanies that disease, it can not be said that he had not intelligence enough to know what he was doing at the very time he made the. transfer.

5. ———: CONSPIRACY: INCAPACITY. Upon a full review of the facts in this case, it is held that there was no evidence of a conspiracy on the part of the transferee and her relatives by which the deceased was. induced to transfer to her certain certificates of stock at a time when he was at intervals delirious from typhoid fever, from which sickness: he died three weeks later; and there being none that he did not,

clearly understand the nature of the transaction and the object of his gift at the time the transfer was made, however delirious he might have been on other days and at other times on the same day, it must be held to be a valid transfer and binding on his estate.

*Appeal from St. Louis City Circuit Court.*—HON. P. R. FLITCRAFT, Judge.

REVERSED.

NATHAN FRANK, CHARLES W. BATES and DAVID GOLDSMITH for appellants.

(1) Gotham's mental aberrations being but temporary results of fever, which clouded or deranged his faculties at times and left them clear at other times, the plaintiff must bring his proof of mental incompetency down to the very transfer in controversy, and show specifically the existence of the temporary derangement at that moment; no presumption of the continuance of a derangement shown to have existed at any other time can be indulged in. This the plaintiff has entirely failed to do. Richardson v. Smart, 65 Mo. App. 18; Staples v. Wellington, 58 Me. 459; Hicks v. Whittemore, 4 Met. (Mass.) 547; Brooke v. Townsend, 7 Gill, p. 31; Boston v. Turpin, 25 Fed. Rep. 7; Peck v. Cary, 27 N. Y. 19; Pierce v. Pierce, 38 Mich. 318; Blake v. Johnson, Millward's Ec. Rep. (Irish), 166. (2) The matters established by plaintiff are merely the ordinary incidents of every serious illness, and are not of sufficient importance to cast doubt upon the competency of Gotham to make the gift in controversy. McMasters v. Blair, 29 Pa. St. 303; In re Davis's Will, 36 N. Y. Sup. 344; Jackson v. Hardin, 83 Mo. 182; Lynch v. Doran, 95 Mich. 395; Kraus v. Stein, 173 Pa. St. 227; Cutter v. Zollinger, 117 Mo. 92; Lewis v. Arbuckle, 85 Ia. 335; Argo v. Coffin, 142 Ill. 368. The defendant's witnesses testify to Gotham's mental competency at the very time of the gift, and detail the circumstances attending the transaction. Their testimony has not been rebutted, and must

therefore prevail. Kraus v. Stein, 173 Pa. St. 227. (4) Sufficient motive for the gift in controversy has been shown in evidence. But even if the gift appeared to be unreasonable, that fact would not warrant its annulment upon evidence otherwise inadequate; proof of improvidence does not establish insanity. Huguenin v. Baseley, 14 Ves. Jr. 291; Richardson v. Smart, 65 Mo. App. 20.

LUBKE & MUENCH for respondent.

(1) The court below has found, from all the evidence adduced before it, that Thomas Gotham, when he made the transfers in question, was not of sufficiently sound mind to understand the significance of the act. That finding is abundantly supported by the evidence in the record, and even in equity cases, great deference will be paid to the finding of the chancellor before whom the evidence was produced. Rawlins v. Rawlins, 102 Mo. 563; Bartlet v. Brown, 121 Mo. 364. (2) (a) Wherever persons stand in such relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the transaction will be void, even if it could not have been impeached if no such confidential relation existed. 2 White & Tudor, Leading Cases in Equity, part 2, p. 1156; Tate v. Williamson, L. R. 2 Ch. Ap. Cas. 55; Huguenin v. Beasely, 14 Ves. Jr. 273; Hamilton v. Armstrong, 120 Mo. 615. (b) The fact that Richardson and Mrs. Hambleton, through whom this voluntary transfer was effected, sustained confidential relations to the supposed donor, will avoid the gift, if their conduct is tainted with the slightest wrong doing, though the donee be guilty of neither fraud nor undue influence. Hamilton v. Armstrong, 120 Mo. 619; Turner v. Turner, 44 Mo. 535; Moore v. Moore, 67 Mo. 192.

(c) While a man of sound mind may voluntarily give away all he has, yet, "when such transaction comes under review, the donees must show that he fully understood the nature of the gift, and its consequences to him, and those dependent on him." Hamilton v. Armstrong, 120 Mo. 622; Thornton on Gifts, secs. 16, 216, 237; Raymond v. Sellick, 10 Conn. 485. (d) The age, health and physical vigor of the donor; the value of the gift, and the proportion it bears to the amount of property remaining to the donor, are all proper matters of inquiry by the court, as a donor will not usually strip himself of property for the benefit of a donee and run the risk of poverty and want. The amount of the gift, other things being even, is often the turning point in its validity. Thornton on Gifts, secs. 237, 444, 447; Hall v. Knappenberger, 97 Mo. 509. (e) The amount merely may, in a voluntary transaction, be such evidence of improvidence as to shift the *onus* of proof to the recipient of the bounty.

MARSHALL, J.—This is a proceeding in equity to set aside a transfer of three shares of the capital stock of the Mechanics Planing Mill, made by the owner, Thomas Gotham, on August 4, 1894, to his half-sister, Robyna Smart, the defendant, while he was sick with the typhoid fever from which he died on the 29th of August, 1894, on the ground that while he was sick and in a dying condition and unconscious of his own acts and incapable of performing any contract or business transaction or of intelligently disposing of his property, the defendant Robyna Smart conspired to get him and did get him to transfer the stock to her.

This is really a scramble for this property between May Oehler, his daughter by his first marriage on the one side, and Robyna Smart, his half-sister on the other side.

The deceased first married in 1859, and his wife left him in 1861. After the separation the child, May, was born. Sometime afterwards his wife secured a divorce from him, with the

custody of the child, and about 1865 she was married again to C. H. Verborg, and May lived with her mother and step-father and was reared by them, and was commonly called by his name. She is now married to Mr. Oehler.

The deceased's father died when he was young and his mother was married again to a Mr. Hambleton, and the defendant, Robyna Smart, is a child of that marriage.

At this term this court has considered and reviewed the principles of law applicable to cases of this character. Sehr v. Lindeman, 153 Mo. 276, and Tibbe v. Kamp, not yet reported. It is not necessary therefore in this case to do more than to refer to those cases, so far as the principles of law are concerned, except, perhaps, to add, that in cases where the alleged incompetency arises from temporary or sudden sickness result-ing in intermittent conditions of sanity and insanity, and there is no prior incapacity alleged or proved, the usual presumption that when a state of facts is once shown to exist they will be presumed to have continued to exist until the contrary is shown has no application, and that the burden of proof is upon the party challenging the legality of the act complained of to show that at the time the act was done there was such incompe-tency. [Von De Veld v. Judy, 143 Mo. 348; Staples v. Wellington, 58 Me. l. c. 459; Hix v. Whittemore, 4· Met. l. c. 547; Ralston v. Turpin, 25 Fed. Rep. 7; Blake v. Johnson, Millward's Ec. Rep. (Irish.) l. c. 166.] The reason for which is that the delirium resulting from diseases is not always or usually continuous, but the patient has intervals when he is perfectly sane, and the brain disorder is only the reflex condition of some other diseased organ and is not itself the seat of the disease or if it is the disease is not of a perma-nent or continuous character. These are natural facts known to all educated persons and do not require the testimony of experts to prove them. Of such is usually the character of the delirium in typhoid fever, and is one of the commonest symp-toms of that disease. It is proper, also, at the outset, to say

Tibbe v
Kamp.
f 152 627
152 628

that this is not a case where the beneficiary stands in a confidential relation to the donor, and therefore the burden of proof is not shifted to her to explain why the gift was made.    Mrs. Smart was the half-sister of the donor, and when he visited St. Louis he stayed at her house, and she seemed to be the favorite relative of his, but this does not bring the case within the exception to the rule that the burden of proof rests upon him who makes the charge because a confidential relation existed between the donor and donee.    Neither can it be said that such a relation existed between the deceased and his uncle Thomas Richardson, who prepared the assignment of the stock, for he was not the donee, and the fact that the deceased had previously sought his uncle's advice in business matters, had borrowed money from him by pledging this stock as security, or that he had left this stock in his uncle's custody, does not create a confidential relation between them, so as to bring Mrs. Smart within the exception to the rule and cast the burden of proof upon her.    The only relation shown to exist between her and the deceased was that arising from being of the half blood, from her kindness to him and his preference for her, and this does not bring the case within the rule as to confidential relation, for if it did when a man did the natural thing and left his property to his relations, it would be regarded as so suspicious as to demand an explanation from the donees, but if he did the unnatural and unreasonable thing of giving his property to a perfect stranger, no such suspicion would attach and the burden of the proof to show he was incompetent when he made the gift would be upon those who challenged the act.    In Tibbe v. Camp, *supra*, the cases in this State bearing upon this question were collated, and the exception to the rule because of the confidential relation of the donee, where the gift is of substantially all the testator's property, was pointed out.

It only remains to examine, scrutinize and analyze the facts in this case and to apply the law, as so lately reviewed, in this State to the facts.

We approach the discussion of the facts in this case without any special respect for the domesticity of the deceased, and without any sympathy for any of his relations.. He was married twice and both wives left him in a very short time after being married to him, and he was at outs with all of his half-sisters and brothers except Robyna.    The record does not show who was at fault, but it reflects no special credit upon him that the two women tried to live with him and could not do so and that he hated his nearest kinfolks.   His first wife's second husband ordered him away from their house when he went to visit his child born after the separation, although they accepted money from him whenever it was offered for the child, which it is true amounted to only the paltry sum of $90 in her whole life.   When his daughter May, the real plaintiff herein, was about to be married he wanted to come and live with her but her intended husband refused, and she, at least, acquiesced in the refusal, on the ground that they could not be friendly with him and her mother both.   After the separation from the first wife and after his daughter became old enough to understand, he lived for years in the same city with her, and she did not know it, for after his death, at the trial of this case, she said he went to Montana in 1861, after the separation, and remained there until 1880.   About five years before his death he became very angry with her because of her efforts to get him to transfer this stock to her at that time. When he was sick with typhoid fever in Clinton, Iowa, his relatives, who lived there, visited him for a few brief moments, at intervals, and his own mother, who went there from St. Louis in response to a message from him that he wanted to see her on *business*, spent most of her time visiting relatives in the country, spent very little time either before or after the transfer of the stock with him, and one and all they left him at an improper place, entirely dependent upon strangers to nurse him and look after his sick wants, which the evidence discloses he was unable to do for himself at all times; his

mother returned to St. Louis leaving him suffering with typhoid fever, attended by a doctor they now say was a quack, and it finally devolved upon his lawyer to have him removed to the public hospital where he could get proper medical attention and suitable nursing. It is no wonder he died. The only wonder is that it took the fever from July 25 to August 29 to kill him under such circumstances. It is true that towards the last his daughter went to Clinton and helped to nurse him until he died. Mrs. Smart, his half-sister, did not go near him at any time while he was sick, but she sent her daughter Rebecca, there with his mother, on the 20th of July (which was before he was taken sick) and they stayed until the 8th of August, which was four days after the transfer was made, and four days before his lawyer had him removed to the hospital. In the light of this case is it to be wondered at that our earliest copybooks impressed upon our youthful minds what then seemed to be the cynical saying of Robert Burns, "Man's inhumanity to man, makes countless thousands mourn." Nor is this all. After roaming for years, the deceased married a second time in 1892. In a short time his wife left him and sued him for maintenance. He also had financial losses, business reverses and other law suits. While so harassed his daughter and his half-sister were both trying to get him to transfer to them each for herself these shares of stock, ostensibly to put them out of reach of his second wife, and he had said he intended to give the stock to one or the other of them, saying to some of the witnesses he intended giving them to his half-sister because she had been "as true as steel to him," "would share her last crust with him," and that "her house would always be a home for him and his mother."

On the 25th of July he was taken sick with a congestive chill, followed by typhoid fever. He was not always confined to his bed, but laid on a lounge in his room, even drove to the bank and drew some money. He would not stay in the

house, but went out several times; was found coming from the saloon with a bottle of beer and some milk, which he mixed, played with like a child, then put behind an old trunk in his room, saying the doctor told him to keep it in a dark place; was also found lying on the streets where he had taken his pillow and laid down, and was also found on another occasion lying in the gutter. He did not always recognize the people around him, did not always know the doctor, but mistook him for the sheriff (which in the light of the testimony in this case is not surprising), and wanted his lawyer sent for before the sheriff (doctor) put the manacles on him; insisted that he had a lawsuit which was set for trial in Chicago on the Monday following the transfer of the stock and that he must be there, when the fact was that he had such a suit pending in Chicago but it would not be reached before the following February, as he had been advised by his lawyer; he would not always answer immediately or coherently and would mistake the identity of persons who called to see him. It is true as claimed by the plaintiff, that the doctor who attended him and the lady with whom he boarded, who seems to have been kind to him, stated that on the morning of the day on which the transfer of the stock was made (August 4th) he was "very bad, and had high fever, with a temperature of from 96 to 103" (a fever with a temperature at 96), and that he had been in about the same condition from the time he was taken sick on the 25th of July, but the lady was not offered as an expert on fever and the doctor could not be ranked very high, as he admitted he did not know what hyperaemia is, or what paranoia is, or whether it was a disease of the bowels or of the bones, but was sure that anaemia was "a condition of the secretive organs, the bowels," and defined it to be "passage from the bowels." On the other hand it appears that on the 3rd of August, the day before the transfer, he took a certificate of deposit out of his pocket and gave it to a friend who was visiting him and asked him to go to the bank and draw five

dollars of it, which his friend did and brought it to him with a new certificate for the balance, which was found in his clothing after his death and passed as assets to his administrator. About an equal number of witnesses on each side swear to his mental capacity; those for the plaintiff declaring him incompetent, and those for the defendant declaring him competent. Most of the witnesses did not see him on the day of the transfer, and the plaintiff seeks to discredit those for the defendant because nearly all of them were relatives of the deceased and of the defendant, but none of them except Robyna are interested in this case or will be benefited a particle by its result. The only persons who were present when the transfer was made were his mother and uncle. His mother says that when she went to see him, accompanied by the daughter of the defendant, on the morning of August 4th, 1894, he asked her to tell his uncle Thomas Richardson, with whom he had left the stock, to bring him the shares of stock as he wanted to transfer them. She asked him to whom he intended to transfer them, and he replied she would find out later. His niece corroborates, substantially, this testimony. His mother says she went to see Mr. Richardson and delivered her son's message. Thereupon Mr. Richardson immediately wrote out the transfer on the back of each of the three certificates of stock (it appears each certificate was for only one share) leaving the name of the transferee blank, and also wrote out a blank power of attorney authorizing the transfer of the shares of stock on the books of the company. Then he and the mother of deceased went to see the deceased. When they arrived there the deceased asked his uncle if he had the stock and was informed that he had, and that the transfers had been prepared, and the uncle asked deceased whose name he should insert as the transferee, and the deceased said Robyna Smart. Her name was then written in the transfers and the power of attorney, and the deceased signed his name to all four papers, in a firm handwriting, an inspection of which fails to disclose even a nervous

condition.   Richardson took the acknowledgment of the deceased thereto and kept the papers by direction of deceased or his mother, it is not altogether clear which, and the mother and uncle left the house.   On the Monday following (August 6), the deceased asked if the stock had been sent to Robyna Smart and finding it had not, directed that it be sent to her by mail, which was immediately done.

This appears to consist with the usual method of transferring stock and fails to indicate any lack of capacity on his part. If it took place as his mother and his uncle swear it did, it ends this case. They have no pecuniary interest whatever in falsifying the facts.   They are not the donees.   True they are respectively the mother and uncle of the donee, but even consanguinity has never been considered a disqualification of a witness, much less proof of his perjury.   In this connection it is proper to say that there is not a word of evidence to sustain the charge that Robyna Smart conspired with any person to procure, or that she did procure, the transfer of the stock to her.   As before stated both she and his daughter had been trying to get him to transfer it, but there is no evidence in this record that Robyna knew he intended to transfer the stock to her at the time he did; she was not present and knew nothing about it until after it was done.

We come back again therefore to the undisputed and unimpeached testimony of his mother and his uncle as to what he said and did when he actually made the transfer, and there is nothing shown which would support the charge that when the transfer was made he did not have intelligence enough to know what he was doing, what property he had or who was to be the object of his bounty.   The plaintiff, however, arrays against this the following conditions: 1st, he had been sick with typhoid fever for eleven days before the transfer was made; 2d, his fever had been raging and his temperature ranged from 96 to 103; 3d, he mistook the identity of visitors whom he had known, more or less intimately; 4th, he did not always

recognize the doctor but at times he thought he was the sheriff, who had come to arrest and manacle him, and wanted his lawyer sent for; 5th, he was constantly asking to see his lawyers and said they had offices in a certain building, when their offices were not in that building at all; 6th, he insisted that he had a case in Chicago which was coming on for trial on the following Monday, when the fact was he had such a case in Chicago but it would not be reached for trial before the following February; 7th, he would not stay in the house, but on at least three occasions he left it, once taking his pillow and lying on the sidewalk, once saying he was going to a dance, and once going to a saloon, buying a bottle of beer and some milk and mixing them "played with them like a child," and finally put them in a dark place in his room, saying the doctor told him to do so; 8th, he insisted that his bowels were not acting when in fact they acted without his being conscious of it; 9th, he exposed himself without regard to who was present; and 10th, he cursed.

All of which he had not done when well and probably would not have done but for the delirium incident to the fever. But none of which proves anything more than what any one suffering with such a fever might do when delirious. They simply illustrate the tricks and pranks that fever plays on the nerve centers and the brain.

All of these acts and conditions are consistent with the temporary maladies of the body and mind caused by severe sickness, which, while they last, incapacitate the person to perform a legal act, but they are not enduring or continuous, and hence the wisdom of the rule which requires proof of such a condition at the very time a challenged act was done. To hold that proof like this, without proof of the actual condition when the act was done, is enough to avoid the act, would be equivalent to holding that a person who was suffering with typhoid fever was incompetent to do any legal act, and this has never been so held by any court.

There is one fact in this case which should receive especial prominence. Before the deceased was taken sick at all, he sent word to his mother that he wanted to see her *on business*, and that if she could not come to Clinton he would go to St. Louis. Accordingly she went to Clinton, arriving there on July 20th, which was five days before he was taken sick. We are not told what the business was about which he was so anxious to see her, nor are we advised why it was not transacted before he was taken sick. Neither is there anything to show what business he had with reference to his mother. But when this incontestable fact is taken in connection with the only business he is shown to have transacted thereafter with which his mother had any concern, it is no very great stretch of the imagination to connect it with this stock. His mother lived with his half-sister Robyna, and he had said to strangers that he intended to transfer this stock to Robyna because she was as true as steel to him, would share her last crust with him, and he and his mother would always have a home with her. There is, therefore, a connection in his mind shown between the stock, his mother and Robyna, which is not true as to his child, for he had become angry with her about five years before because of her importuning him to give her the stock. This fact taken in connection with the fact that he did transfer the stock to Robyna, and that this is the only business that it is shown or intimated that he transacted with his mother, evidences an intention on his part to transfer the stock to Robyna quite awhile before he was taken sick, and shows that he had finally decided to whom he would give the stock. It also corroborates the uncontradicted testimony of his mother and Rebecca Smart, that he, himself, brought up the subject of the stock, and asked his mother to tell his uncle to bring him the stock as he wanted to transfer it, and also supports the testimony of his mother and uncle that he told his uncle to put Robyna's name in as the donee. It

all goes to show that he did with his own what he had intended to do before he was stricken with the fever.

The plaintiff insists, however, that it is unreasonable to believe that he would strip himself of his best and most available asset when he was sick and needed money, especially as he expected soon to be well, and hence was not giving it away because he would have no further need for it. There is, of course, much force in this contention, but it comes with bad grace from the daughter, for she did not think of that when she was urging him to give her this stock. However, the record shows that he did not strip himself of his property, for he had money in the bank, five dollars of which he had drawn the day before, and he had a certificate of deposit for the balance in his pocket. His administrator has also realized some eight hundred dollars from other property he owned beside this stock. It may have been that he expected to get well and thought he had enough left without this stock to take care of himself or that if he gave this stock to Robyna he would always have a home with her—he knew he could not have a home with his daughter for that had been refused him when he proposed it—or he may have believed he would not have need for any money very long, and that if he did not give this stock to Robyna before he died or leave it to her by will, she would not get it, but that it would pass to his daughter, and so he arranged it himself as he wanted it.

There is as much foundation for one theory as there is for the other.

The sum of the whole matter is that it was his property. He had a right to do what he pleased with it. He is not shown by this record to have been incapable of knowing what he was doing. He has acted, and what was said in reference to a will by the Supreme Court of Michigan applies equally as well here. "If a man's acts, by reason of such incidents as have been shown in this case, make such acts the subject of post-mortem determination, dependent upon the whims or

caprices of a jury, then it may well be said by him who wishes to convey his property, 'I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.' " (Lynch v. Doran, 95 Mich. l. c. 409.)

This is the second suit based upon this controversy. In the first case, the plaintiff obtained judgment, but on appeal the St. Louis Court of Appeals reversed the judgment and dismissed the bill without prejudice. (65 Mo. App. 14.) Then this suit was begun. Upon a trial again in the circuit court, the evidence being almost the same as on the trial of the first case, the plaintiff again obtained judgment and defendant appealed to this court. It is now urged that this court should not interfere with the judgment because two *nisi prius* judges have found the facts in favor of the plaintiffs, and they had a better opportunity of seeing the truth because the witnesses were before them. Much deference is properly shown to the finding of facts by the trial court in equity cases, but such finding is not binding on the appellate courts. In this case much of the most important testimony was presented to the trial court in the shape of depositions, so that as to such testimony the trial judge was in no better condition than this court. But ultimately the responsibility for the judgment rests with the appellate court, and no judgment can stand that does not meet with its approval. Such is the policy of our jurisprudence and the genius of our government. We have been compelled to reach the conclusion that the judgment of the circuit court is erroneous, and it is, therefore, reversed, and we leave the property where its owner put it.

It is so ordered. All concur.