ANNA LACK WILLIAMS, Appellant, v. THOMAS LACK, WILLIAM ALEXANDER LACK, EMMA LEIGH LACK, OVA C. BURNS and MARGUERITE LACK, Executrix of Last Will and Testament of ALEXANDER LACK.—40 S. W. (2d) 670.

Division One, June 24, 1931.

*Clark, Boggs & Peterson* and *S. A. Payne* for appellant.

*Neale, Newman & Turner* and *Mann, Mann & Miller* for re-spondents.

FERGUSON, C.—This is an action, under the statute, to contest the will of Alexander Lack, who died in Lockwood, Dade County, Missouri, on the 6th day of April, 1925, at the age of eighty-one years. The alleged will was executed on the 9th day of November, 1923. The grounds of contest are mental incapacity and undue influence.

Alexander Lack and Emma Buchanan were married at Dade County in 1874, and made their home in Lockwood. Four children were born, one daughter, Anna, who is the plaintiff in this action, and three sons, Charlie, Blaine and Tom. Two sons, Charlie Lack and Blaine Lack, predeceased testator. Charlie Lack left no lineal descendants surviving him. Blaine Lack was survived by his widow, Marguerite Lack, named as executrix in the will, and two children, William Alexander Lack and Emma Leigh Lack. The son Tom, the two grandchildren, and the daughter-in-law as executrix, are the defendants in this action.

In 1909 Alexander Lack's wife obtained a divorce, and a property settlement was made. Thereafter, two of the children, Anna and Tom, neither being married at that time, lived with the mother in a home at Lockwood provided for her by the terms of the divorce settlement made by Lack. Alexander Lack continued to reside at Lockwood until his death. He bought, sold, fed and shipped cattle, which business he actively carried on to within a short time prior to his death. He was a competent and successful trader and by his own industry and business sagacity accumulated a large estate. In the contested will he specifically devised 1040 acres of land, and by the residuary clause devised and bequeathed his remaining large property interests to his son Tom Lack and his two grandchildren, William Alexander Lack and Emma Leigh Lack, according to terms and interests therein set out and defined. His daughter Anna, the plaintiff herein, was bequeathed the sum of one dollar.

The defendants, as proponents of the will, made proof of the due execution of the contested writing and the sanity of the maker at the time. Whereupon the plaintiff offered testimony to sustain the grounds of contest alleged in her petition, and at the close of plaintiff's evidence the court gave a peremptory instruction to the jury to find the issues for the defendants and to establish the will. A verdict in accordance with the instruction of the court was rendered and from the judgment entered thereon plaintiff appealed to this court.

36

We find no evidence whatsoever tending to support the allegation of undue influence, and appellant does not contend here that the issue should have been submitted to the jury. The proponents of the will, respondents here, made formal proof by subscribing witnesses of its execution in conformity with the requirements of the statute (Sec. 507, R. S. 1919) and that the testator was at the time of sound mind. After this prima-facie proof of due execution and testamentary capacity "the weight of the evidence was against the contestant. Hence it became necessary" for her "in order to obtain a submission of the issue of testamentary incapacity to adduce some substantial evidence tending to support that affirmation," and if she failed to do so there was no error on the part of the court in directing a verdict for respondents. [Sanford v. Holland, 276 Mo. 457, 207 S. W. 818.] The essential question therefore presented by this appeal is whether, allowing appellant the benefit of the most favorable evidence and all reasonable inferences to be drawn therefrom, there is any substantial evidence to support the allegation of testamentary incapacity. If so the court erred in not submitting that issue to the jury.

The testimony discloses that Lack had stated to some of his friends that at some time not fixed he had caused a will to be drawn by his attorney, Mr. Mann of Springfield, by which he had divided his property equally among "all of his children." It does not appear whether this will was ever executed. Subsequent to the time this first will was drawn and in 1922 his daughter Anna, the appellant, married a man named Williams who was a stranger in the community. Williams had lived in Arkansas and he and Anna had never seen each other and had no personal acquaintance prior to the time he came to Lockwood. In some manner, not explained, a correspondence was begun between them which resulted in Williams coming to Lockwood for the very apparent and sole purpose of entering into a marriage with her. Within a few days after his arrival there, they were married and he and Anna thereafter made their home with her mother, the divorced wife of testator. At the time of their marriage Anna was forty years of age and Williams forty-seven years of age. It seems this event occasioned some gossip in the community, and the appellant testified that shortly thereafter her father was invited to dine with the family, seemed favorably impressed with Williams and remarked to her "I think you have married a mighty fine fellow, Anna, after all." A change in the situation and Lack's attitude toward his daughter and son-in-law occurred, however, when it was discovered that Williams had a wife residing in Arkansas from whom he had not been divorced.

Whereupon Lack and his son both protested against Anna continuing to live with Williams as his wife, but she ignored and resented their objections and she and Williams continued to live together as husband and wife at her mother's home. While Lack and his son Tom objected to and opposed Williams, Anna and her mother approved and defended him. Finally Tom caused a bigamy charge to be filed against Williams. He was tried and convicted. Appellant testified he was convicted "under a boten verdict." Mrs. Lack, the divorced wife, employed a lawyer to defend Williams, and after he was convicted and had spent one night in the county jail she paid the fine of $500 assessed against him and secured his release. He straightway returned to Mrs. Lack's home. We quote from the cross-examination of appellant:

"Q. Then where did he (Williams) go when he got out of jail? A. He came to our home.

"Q. And lived with you again? A. Yes, sir.

"Q. And your father objected didn't he? A. Well he objected, but he never did say anything to us; and he didn't come to me personally."

It was about this time testator went to Springfield and advised his attorney there, Mr. Mann, that he wanted the will drawn which is here contested. He gave Mr. Mann a description of his property and directions as to how he desired to devise and bequeath same. The attorney outlined the proposed will which was approved by the testator, instructed testator concerning the execution of same and shortly thereafter sent the completed draft by mail to the testator at Lockwood. Lack executed the will at the bank in Lockwood where he had over a period of years transacted a large volume of business. The subscribing witnesses were business men of the community, the cashier of the bank, a stockman and farmer, and a merchant, who were well acquainted with Lack and had known him intimately and personally and had business dealings with him during a period of from twenty to thirty-five years. The two subscribing witnesses who testified stated that they had never, at any time, observed any impairment of Lack's mental faculties or business judgment, that he was was thoroughly familiar with his property and affairs, and that he was sober and of sound mind at the time he executed the will.

Doctor Wren, a witness for plaintiff, testified on cross-examination:

"Q. Now, he talked to you about his will, didn't he? A. Yes; he came back—he explained it to me when he came back from Springfield.

"Q. He told you about it then—when he came back from Springfield? A. Yes, sir.

"Q. Explained it to you? A. Yes, sir.

"Q. Did he seem to know how he had willed his property? A. Yes, sir.

"Q. And why he had done it? A. I don't know if he particularly said why, but he told me what he had done.

"Q. Now at that time, Doctor, was he sober? A. He seemed to be."

Witness S. J. Hyatt, age seventy-seven years, a witness for plaintiff, who had known Lack for sixty years and had frequently conversed with him, testified:

"Q. Did he [Lack] tell you how he had disposed of his property in the last will? A. Yes, he come to me one day, and he says, 'I wrote another will,' and he says, 'I went up to Springfield,' . . . and got Ed to write him another will. And, in this time, Annie had married, and he said he had disinherited Annie—cut her out of the estate on account she married a man he didn't like. He said he didn't intend—the words he used—for a damn thief to have any of his property."

Later Williams went back to Arkansas and instituted a suit for divorce there. Appellant testified that her father and brother endeavored to defeat this effort to obtain a divorce and that "Tom and my father were fighting the divorce; they fought it so long Mr. Williams was a long time getting it." Having been granted a decree of divorce, Williams returned to Lockwood and he and Anna were again married in October, 1924, and resumed their life together at the home of Anna's mother. Between 7:15 and 7:30 P. M. on November 23, 1924, Williams was shot and killed in an alley near the home. The inference from the scant reference made to this tragedy in the testimony is that Williams was assassinated and that the perpetrator of the deed was never discovered, as it no where appears that anyone was charged with or convicted of the crime. During the trouble about Williams, Anna ceased to speak to her father, and after the death of Williams and when she did meet her father at various times and places she refused to speak to him or have anything to do with him. When shortly before her father's death the attending physician and neighbors told her that his death was imminent she refused to go to him, and upon his death to attend the funeral.

Plaintiff's witness Rickman testified that in 1917 or 1918 he lived near Lack and his son, Charlie, who were "batching" together; that he would see Lack frequently in the evenings "maybe once or twice or three times during the week" and that "at most such times" Lack was intoxicated; that he "hardly ever saw him at any other time during the day." Plaintiff's witness, S. J. Hyatt, to whom we have heretofore made reference, testified as to Lack's

drinking habits: "he drank more or less all the time I knew him, but not to excess. Oh! he would get on a spree once in awhile—maybe once a year; as he grew older he got more in the habit; the last ten years of his life he dissipated very bad—awful bad; when a trade was up he didn't drink; he didn't drink when on business; he didn't drink when he was on a trade; as a trader and business man Lack was a good business man."

P. H. McGee, witness for plaintiff, testified that Lack was a "hard drinker;" that Lack said he "couldn't hardly get along without whiskey" and that "his physical condition declined for several years before he died—some four or five years."

Emma Lack, the divorced wife, stated that Lack "had been using intoxicating liquor for twenty or twenty-five years, any way —all his life he drank liquor and was drunk most of the time for the last twenty years." The witnesses were in accord in acknowledgment of Lack's business capacity and his successful management of his business affairs and transactions which seems to have continued to within a few days of his death. Doctor Wren, the physician who attended Lack in his last illness, stated he had practiced medicine in Lockwood for eleven years; that "he knew him [Lack] very well;" that he "treated him for little things that he needed medicine for—off and on for several years;" that Lack used intoxicating liquor "quite often;" that during the last illness and "about three weeks" before his death, Lack "had hallucinations" which were only temporary; that during the years he had been acquainted with Lack and had treated him, he never observed "anything wrong with him mentally;" that the occurrence of the temporary hallucinations about three weeks before his death "was the first time I ever saw the least thing that appeared to be wrong with him mentally" and that after that he was "just as bright in mind as I ever saw him" and talked freely and intelligently and gave directions for the care and "feeding of his cattle." None of the foregoing witnesses detailed any evidence, facts or circumstances as a basis for or undertook to testify to an opinion that Lack was of unsound mind at, or near the time the will was executed or at any other time. The will was executed seventeen months prior to Lack's death. Where a charge of testamentary incapacity is made against a testator "evidence is competent to show the condition of his mind long prior to and closely approaching the time of the execution of the will, as well as the condition of his mind shortly subsequent to its execution. The purpose of such testimony is to indicate the state of his mind at the very time of the execution of the will. *The condition of his mind is tried as of that time.* All such evidence is receivable for the purpose of indicating to the jury whether or not the testator at the time the will was executed had sufficient mental capacity to

fill the requirements of the law." [Buford v. Gruber, 223 Mo. 231, 253, 122 S. W. 717, 722; Von De Veld v. Judy, 143 Mo. 348, 45 S. W. 1128.] The test of mental capacity should relate and be applied to the time of the execution of the will in question and not the condition of the testator's mind during his last sickness, seventeen months thereafter. The fact alone that testator was addicted to the habit of using intoxicating liquor neither raises a presumption nor permits the inference that he was mentally incompetent at the time he executed the will or lacking in testamentary capacity. Although the use of intoxicating liquor may leave a person "weakened both in mind and body, yet so long as there has not been a destruction of that mentality which the law requires for the making of a will, it cannot be said" that he is incapacitated to make a valid will. [1 Alexander on Wills 475.] The subscribing witnesses testified that Lack was sober at the time he executed the will and their testimony stands uncontradicted. There is nothing in the evidence to indicate that his mind had at that time become so impaired or enfeebled by his use of intoxicating liquor or from any other cause that he could not efficiently conduct his business affairs or as to render him mentally incapable of disposing of his property by will.

We come now to an analysis of the testimony of expert witnesses which was designed to show that Lack's mind was diseased at the time he made the will. Doctor Wren, the physician attending Lack during his last illness, and who, as we have heretofore stated, was well and intimately acquainted with and had treated him as a physician at intervals over a period of years, testified that Lack died of paresis; that he began treating him "along the first of January, 1925," and that he died April 6th following; that the paresis began a "very short time before he died—about the time he got sick." The witness was asked this question on cross-examination: Doctor, regardless of what Uncle Pes Lack may have died of, whether it be paresis or something else, your opinion is that this disease started only about two or three months before he died, is it? To which the witness answered, yes, sir. The following excerpts from Doctor Wren's testimony are here set out, in view of the expert testimony based upon Doctor Wren's statement that the testator died of paresis.

"Q. Your diagnosis of paresis was not based on any evidence or any belief on your part that he had ever had syphilis? A. No, sir, it was not.

"Q. Do you accept the statement, 'no syphilis, no paresis?' A. No.

"Q. Now, Doctor, did you ask Mr. Lack if he ever had the syphilis? A. No, sir.

"Q. You never even asked him that? A. No, sir.

"Q. Did you make any test for syphilis? A. No, sir.

"Q. Did you make the Wassermann and Lange test for syphilis? A. No, sir.

"Q. The Wassermann test and Lange tests are two of the recognized tests for syphilis? A. Yes, sir.

"Q. So far as you know, in all your treatment of Mr. Lack, and knowing him and talking with him, you never saw any evidence of syphilis in that man, did you? A. None; no, sir."

The witness further stated: "I am willing to admit quite a few cases of paresis are due directly to syphilis; but I think there are others that are not," and that there are other diseases which have symptoms "more or less in common" with paresis. The plaintiff then offered as witnesses three doctors, experts in mental diseases, the superintendent of State Hospital Number 1 at Fulton, the first assistant physician in the same institution, and the superintendent of State Hospital Number 3 at Nevada, Missouri. Neither of these witnesses had ever seen Lack. These doctors are agreed and positive on the proposition that "no syphilis, no paresis" and that the ordinary duration of paresis is two to five years. Upon the hypothesis that paresis is the result of syphilis and has no other cause and that the testator had syphilis on the 9th day of November, 1923, when he made his will, they say his mind would have been impaired at that time. They did not undertake to say, as of course they could not, to what degree testator's mind would have been impaired or whether such a mental destruction and impairment would have been wrought that he would not at that time have had sufficient intelligence to understand and know the nature of the act he was performing, the property he possessed, its extent and value, the natural objects of his bounty and to whom he desired to give his property. They admit that though the ordinary duration of paresis is from two to five years, that a man so afflicted might die therefrom at any time after the disease took hold upon him. They further testified that if the diagnosis that testator died of paresis. made by Doctor Wren, did not take syphilis into consideration as the cause, they would have no confidence in the diagnosis. From the testimony of these expert witnesses we glean the following concerning the more common symptoms and the effect of paresis: that in the early stages of the disease business judgment is impaired, the person afflicted "loses judgment" and "has no judgment;" that one of the early and most noticeable symptoms is fixation of the pupils of the eyes; and that the power of speech becomes impaired with a noticeable inability to articulate and clearly pronounce words. There is not a scintilla of evidence in the entire record of the presence of any of these symptoms at

any time and the testimony tends rather to negative their existence. The record abounds with proof that Lack at all times exercised sound business judgment. His business activities continued to within a very short time before his death. Not one instance is pointed out where he made a bad trade, lost money or exercised bad business judgment. Doctor Wren was well acquainted with him, as were the other witnesses, other than the experts. Doctor Wren stated that in the years he had treated Lack he never saw any evidence of syphilis. No witness testified to any impairment of judgment, of speech or the fixation of the pupils of the eyes at any time. The gist of the testimony of the witnesses from the community where Lack lived  and died and who knew him through the years of his business activities was that he was a hard drinker and a good trader, but that he did not drink when he was engaged in business transactions. One of the expert witnesses testified: "If there was nothing wrong with his [Lack's] mind I would infer that he did not have paresis." We refer again to the testimony of Doctor Wren that he never at any time observed anything wrong with Lack mentally until the hallucinations occurred about three weeks before his death and after that he was "just as bright in mind as I ever saw him." No circumstances, conduct or incidents appear in the record tending to show any mental impairment as of, or near, the time of the execution of the will or at any other time except the very temporary hallucinations occurring almost seventeen months after the will was executed, and the testimony of the expert witnesses supplies no substantial evidence of mental incapacity. Testamentary capacity having been shown and being unimpeached and no undue influence having been exercised, though the action of testator in devising and bequeathing all his property to his son Tom and to his two grandchildren, without making provision for his daughter, the appellant, to share therein, be deemed inequitable or unjust and the wisdom or propriety thereof be questioned, yet it cannot be considered or held by the courts to affect the validity of the will. That a testator who is of sound mind and who executes a will as his free and voluntary act manifests either prejudice or partiality therein in regard to his children does not affect the validity of the will, "nor would it alter the case that such feelings are unjustly harbored. . . . The absolute ownership of property implies the right of arbitrary disposition of it according to the loves, hates, or caprices of the grantor." [Hayes v. Hayes, 242 Mo. 155, 145 S. W. 1155.] "The sum of the whole matter is that it was his property. He had a right to do what he pleased with it. He has not been shown by this record to have been incapable of knowing what he was doing." [Richardson v. Smart, 152 Mo. 623, 636, 54 S. W. 542, 546;

Conner v. Skaggs, 213 Mo. 334, 349, 111 S. W. 1132, 1135.] "The standards and tests of mental capacity to make a will have been so repeatedly announced in this State and are so firmly established that it is hardly necessary to refer to citations. A testator with mind enough to understand the ordinary affairs of life and the kind and extent of his property and who are the natural objects of his bounty and that he is giving his property to the devisees mentioned in his will in the manner therein stated, is capable of making a will under the law of this State." [Sanford v. Holland, supra.] There is no substantial evidence in this case tending to show that the testator was lacking at the time he executed the will in question in any of the qualifications necessary to the making of a valid will, and since the prima-facie proof, together with all the evidence in the case, shows that at the time he possessed the requisite testamentary capacity and there being no proof of undue influence as charged in the petition, the trial court properly directed a verdict sustaining and establishing the will.

Appellant sought to introduce into evidence a certified copy of the record of the death of Alexander Lack issued and certified to by the State Registrar of Vital Statistics under the provisions of Section 5816, Revised Statutes 1919. The original certificate was made and signed by Doctor Wren, "the physician last in attendance on the deceased." Section 5802, Revised Statutes 1919, specifies what the certificate of death shall contain and then provides that "the medical certificate shall be made and signed by the physician if any, last in attendance on the deceased, who shall specify the time in attendance, the time he last saw the deceased alive and the hour of the day at which the death occurred. And he shall further state the cause of death, so as to show the course of disease or sequence of causes resulting in the death, giving the primary cause, and also contributory causes, if any, and the duration of each." The certificate made by Doctor Wren stated the cause of death as "paresis senility, entire body" however the duration. "the course of disease or sequence of causes resulting in the death" or the "contributory causes, if any," is not set out or shown. Section 5816, Revised Statutes 1919. provides: "any such copy of the record of a . . . death, when properly certified by the State Registrar to be a true copy thereof, shall be prima-facie evidence in all courts and places of the facts therein stated." Respondents objected to the admission of the certified copy of the certificate of death in evidence on the ground that the certificate of death did not conform to and comply with the requirements of Section 5802, Revised Statutes 1919 (supra), and further that the provision contained in Section 5816 making the certified copy of the record of death "prima-facie

evidence of the facts therein stated" is unconstitutional. The trial court sustained the objections, and refused to admit the certified copy in evidence. Appellant saved exceptions thereto and now assigns as error the action of the court in sustaining respondent's objections and excluding the certified copy of the certificate of death. Our conclusion as to this assignment of error obviates a determination of the merits of respondent's objections. Appellant's purpose was to show the cause of death to have been paresis. Assuming that the certified copy of the record of death was properly admissible in evidence, nevertheless appellant called Doctor Wren as a witness and he testified to all the matters and statements made and set out therein and that deceased died of paresis. Appellant had the full benefit of the excluded evidence in the testimony of Doctor Wren who made and signed the certificate of death, the certified copy of which was offered in evidence by appellant, and it does not appear how appellant was, under the circumstances, prejudiced by its exclusion. Under all the evidence the directed verdict was fully warranted, no other verdict could be sustained and the judgment is manifestly for the right party, therefore if the exclusion of the certified copy of the record of death be error it is harmless error.

The judgment is affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.