## CHADWELL et al. v. REED, Appellant.

### Division Two, July 3, 1906.

1. **INCAPACITY: Presumption.** The presumption is that all men are sane. A party claiming under a deed is not bound to prove the sanity of the maker.

2. ——: ——: **Deed to Wife.** The fact that an old man conveyed all his property to his wife by voluntary deed raises no presumption of his incapacity to make the deed.

3. ——: **Burden.** The burden of proving the unsoundness of mind and incapacity of the grantor, at the time of the execution of a voluntary deed to his wife, rests upon the party seeking to have the deed set aside.

4. ——: **Test: Making Deed.** The legal test of the capacity of a grantor making a voluntary conveyance of all his property to his wife, to the exclusion of his children, is his capacity to understand the matter in hand and the effect of the transaction.

5. ——: ——: **Trust.** The grantor's capacity is not to be determined by the fact that he made the deed to his wife with the understanding that she would make another to his children or would by will devise the property to them. And even if it becomes apparent that she will not carry out his expressed wishes to her, that will not affect his capacity to make the deed.

6. ——: ——: **Facts.** One physician testified that about the time the deed to his wife was made the grantor called at his office in connection with the contemplated execution by him of a deed or will, and tried to explain the nature of the transaction, but failed; and that he was then in an advanced state of paralysis, of body and mind, could not talk connectedly, nor protrude his tongue in a straight line, and that he could not

have engaged understandingly in a business transaction such as the making of a deed. Another physician said he had been the grantor's family physician for years, had never heard his competency called in question, saw him about the time the deed was drawn and he was in his usual soundness of mind, and that he was present a few months later when he was paralyzed from a recent transfusion of blood to the brain. The man who drew the deed said the grantor came to his office with his wife and one son, and without suggestion from them told him he wished to convey the property to his wife, and that he then thoroughly understood what he was doing and he saw nothing to indicate any unsoundness of mind. *Held*, that no incapacity was shown, and that the deed cannot be set aside on that account.

Appeal from Knox Circuit Court.—*Hon. E. R. McKee,* Judge.

REVERSED.

*L. F. Cottey* for appellant.

(1)  The law authorizes a man who is *compos mentis* to make such disposition of his property as he pleases, subject to his debts, if any.  The sole issue here is:  Was the grantor, Waterman Reed, at the time the conveyance in question was made, mentally incapable of making it?  The burden of proving that issue was upon plaintiffs.  The evidence produced at the trial not only failed to establish mental incapacity, but on the contrary affirmatively and beyond a reasonable doubt established mental capacity in Waterman Reed, at the time the deed was made.  The test is:  Did the grantor at the time understand the nature and effect of the transaction?  Or, in other words:  Did he know what he was doing and to whom he was giving his property?  The undisputed evidence is that he did.  The law, in its application to the facts in this record, is well settled.  The following decisions are so apposite, and so profound in research on this question, that I need do no more than refer to them in this connection:  Cutler v. Zollinger, 117 Mo. 92; McKissock v. Groom, 148

Mo. 459; Fitzpatrick v. Weber, 168 Mo. 562; Study-baker v. Cofield, 159 Mo. 596; Richardson v. Smart, 152 Mo. 623; Hamilton v. Armstrong, 120 Mo. 597; Linkins v. Linkins, 122 Mo. 279; McKinney v. Hensley, 74 Mo. 326; Doggett v. Lane, 12 Mo. 215; Hughes v. Rader, 183 Mo. 630; Catholic University v. O'Brien, 181 Mo. 68; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Fulbright v. Perry Co., 145 Mo. 432; Riggin v. Westminster College, 160 Mo. 570; Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindemann, 153 Mo. 276; Von De Veld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; Wood v. Carpenter, 166 Mo. 465; Southworth v. Southworth, 173 Mo. 59; Hamon v. Hamon, 180 Mo. 685; Story v. Story, 188 Mo. 110. (2) The only semblance of testimony introduced by plaintiffs to sustain incompetency was the "opinions" of some of their witnesses to the effect that the grantor did not have mental capacity sufficient to make the deed in question, which "opinions" were not based on any acts or facts showing mental incapacity. Mere opinions of witnesses, unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the grantor, or testator, knew what he was doing and to whom he was giving his property. Sehr v. Lindemann, 153 Mo. 288; Fulbright v. Perry County, 145 Mo. 443; Riley v. Sherwood, 144 Mo. 364; McFadin v. Catron, 138 Mo. 216; Wood v. Carpenter, 166 Mo. 487; Southworth v. Southworth, 173 Mo. 73; Hughes v. Rader, 183 Mo. 704. (3) The judge was manifestly in doubt as to the correctness of his finding and decree, on the ground of mental incapacity of the grantor; otherwise, he would not have further found that the deed was of a testamentary character. If it was void because of the incapacity of the grantor, that was the end of it, and hence there was no occasion for a further finding, if the first was correct. In any event, it was error to hold that the deed was of a testa-

mentary character. It was admitted by the pleadings that the deed was absolute in form; that it was delivered and recorded the day of its execution; and that defendant claimed under it absolutely. The test to determine whether an instrument is a deed or a will is whether it is to take effect *in praesenti* or after the death of the maker. Murphy v. Gabbert, 166 Mo. 596; Griffin v. McIntosh, 176 Mo. 392; Utter v. Sidman, 170 Mo. 284; Chew v. Kellar, 171 Mo. 215. It is too plain for argument that the instrument in question was a deed and not a will; and was not of testamentary character.

*O. D. Jones* for respondents.

In the light of the following authorities applied to the evidence in this cause, the burden of proof as to Reed's mental capacity shifts to defendants: Cadwaleder v. West, 48 Mo. 483; Martin v. Baker, 135 Mo. 503; Barkley v. Association, 153 Mo. 315; Studybaker v. Cofield, 159 Mo. 612; Ryan v. Ryan, 174 Mo. 286.

BURGESS, P. J.—This is a suit to set aside a deed made by Waterman Reed, deceased, in his lifetime, to his wife, Ruth Reed, the defendant, on the 31st day of January, 1895, conveying to her the farm and homestead, consisting of 590 acres, upon which they then resided. The land was worth at the time from ten to twelve dollars an acre, and was then encumbered with a deed of trust for $2,850. At the time of the trial, June 3, 1903, the land was worth from twenty to twenty-five dollars an acre, and was still encumbered with the said deed of trust.

On the 31st day of January, 1895, Waterman Reed, accompanied by his wife and son, Sherman or "Golden," went to the Knox County Savings Bank, at Edina, and told the cashier of said bank, Capt. Henry R. Parsons, that he wanted to convey his farm to his

wife, and inquired of him as to the proper way to have it done. After being advised in that respect, the transfer of the title was effected by a deed made and executed by Waterman Reed and his wife conveying the land to said Henry R. Parsons, and by a conveyance made immediately thereafter by said Parsons to the defendant. The deeds so made were delivered and recorded that day.

Waterman Reed died the latter part of March, 1895, and this suit was instituted November 3, 1902.

The plaintiffs are three of the children of the grantor, Waterman Reed, and the defendant is his surviving widow. They had five children, but the other two children were satisfied with the disposition their father had made of the farm, and declined to be made parties to the suit.

The validity of the deed is assailed in the petition on the ground of the want of mental capacity of the grantor, Waterman Reed, and of lack of any consideration moving to him; also on the ground of undue influence over him by defendant and one of her sons. It is also averred in the petition that the deed was made to defendant in trust; that she was to divide said lands, or the proceeds thereof, above her living, among the five children, and that the defendant now denies such trust; that the reason this suit was not sooner brought was that for four or five years the defendant admitted such trust.

The petition, omitting the formal parts and the description of the land, is as follows:

"Plaintiffs for second amended petition herein say they are three of the five children and heirs at law of Waterman Reed, late of Knox county, Missouri, now deceased. That the defendant is their mother and the widow of said deceased who died intestate in this county and the owner in fee of the following lands: . . . .

"That plaintiffs as children and heirs of said deceased are entitled each to an undivided one-fifth of said land, subject to the dower and homestead rights of the defendant, and subject also to a deed of trust and encumbrance thereon, dated April 1, 1902, to secure the payment of $2,850 to one Mortimer Parsons, with interest at 6 per cent per annum, and recorded in book 54, page 413, deed records of Knox county.

"Plaintiffs state that for sometime prior to the 31st day of January, A. D. 1895, the said deceased was old and infirm in body and mind, and had become and was incompetent to and had not for some time attended to his business affairs, and much less able to make a deed. That at that time and while in that condition the defendant and her son, A. S. Reed, and Golden Reed, by advice, persuasion and undue influence, induced him to believe that he might and ought to make a general conveyance of all his property in lands, the 590 acres hereinbefore described to the defendant, his wife, about eleven years younger than he and then in robust health, and that she could and would finally by will or otherwise, make a division of his estate as he desired it to be done, of share and share alike to his children. And that with that understanding and agreement and by persuasion and influence, they did, on account of his weakness and imbecility of mind and when he was unable to fully comprehend and understand the effect thereof, make a deed absolute in form to Henry R. Parsons on that day and date for all his said land, and being nearly all his property, reciting that it was for one dollar and other valuable considerations, when in fact it was for no consideration moving to him, said grantor. That immediately on the same day at the same sitting and as part of the same transaction, said Parsons and his wife Sarah made and delivered to the defendant a deed for all said lands, also reciting that it was made for one dollar and other valuable considerations; and was in fact made for no consideration. That

said grantor, the deceased, was then in such a state of debility of body and mind, as to be incapable of making a deed or engaging in such business with a comprehension and understanding of it. That after its execution he proposed that his will and that of his wife be prepared, and upon being informed he had nothing to will, wept like a child. And in a few days thereafter he died.

"That defendant accepted said deeds and put them on record. But for a few years thereafter she admitted the trust of said deeds, that she was to divide said lands or the proceeds thereof above her living and support among hers and the children of deceased. And did actually make a will or two to that effect, partial, however, to the two children and heirs who failed to join in this suit. That she has finally become so prejudiced against these plaintiffs she will not visit or communicate with them, and now absolutely repudiates and denies the terms of the agreement and trust and terms upon which she and her son procured it from the deceased and claims under it absolutely. That the reason this suit was not sooner brought was that for four or five years the defendant admitted said trust and its legal and moral binding effect upon her.

"That the other two children and heirs of said deceased are satisfied with the said deeds and disposition of the said land, and for that reason refuse to join in this suit, and for that reason are not made parties herein.

"Plaintiffs ask that both said deeds made by deceased to said Henry R. Parsons and by him and wife to defendant be set aside and for naught held and for general relief and costs of suit."

The answer denies the allegation of the petition with respect to the want of mental capacity of the deceased to make the deed in question; denies the charge of undue influence, and denies that the deed was made to defendant in trust. It affirmatively avers that the

deceased was of sound mind and fully understood the nature of the business in which he was engaged when he made said deed; that the deed was not procured or induced by persuasion or undue influence on the part of the defendant or anyone else; that ever since January 31, 1895, the date of the execution and delivery of said deed, the defendant has been in the actual possession of said lands, claiming title thereto under said deed, and has made lasting and valuable improvements thereon of the value of one thousand dollars. The answer also avers that plaintiffs have been guilty of laches in bringing this suit and pleads the same in bar of this action.

The reply was a general denial.

This interrogatory was submitted to the jury:

"At the time deceased Waterman executed the deed in question to the defendant Ruth Reed, to-wit, on the 31st day of January, 1895, was he, said Waterman Reed, in such condition of mind as to render him incapable of understanding and comprehending the nature, character and effect of such conveyance?"

Plaintiffs' first and most important witness was Dr. Ellis, of La Plata, Missouri, who said that he was in his sixty-ninth year and had been practicing medicine for forty-three years; that he had known Waterman Reed for about twenty-five years and had been his physician the greater part of that time. Witness did not visit Waterman Reed professionally in the year 1894, but met and had some conversation with him at Brashear, in the latter part of the summer or early in the fall of 1894. After leaving him witness was impressed with the fact that Mr. Reed's mind was not as good as it had been; did not seem to be so bright and brilliant. Witness was visited at his office in La Plata by Mr. Reed in the latter part of January or early in February, 1895, when he made an examination of Mr. Reed in a professional way. From his examination of Mr. Reed he thought he was partially paralyzed as a

result of hemorrhage on the brain, "and most likely a slight softening in the brain at these particular points; it is hard, very hard, to diagnose those cases, but we just take the general history of them."

In answer to a specific question as to Mr. Reed's condition at the time, Dr. Ellis said:

"Well, at that time he was paralyzed; the paralysis was pretty general. He couldn't move his hands or feet correctly. He could move them, but not correctly, and he couldn't talk to do much good. His speech was very difficult; his expressions were very imperfect; his vision was probably all right; his eye was drawn, one eye, I think it to be the left eye; he could not protrude his tongue in a straight line; his talk was broken. He would commence to tell you about some of his business concerns, and directly he would change on to some other subject. He could not connect his conversation very long."

The conclusion of witness regarding Mr. Reed's ability to transact business at that time is summed up in the following questions and answers:

"Q. I will ask you from your observation and examination of him there that day and hearing what he said to you, do you think he was in a condition to engage in a business transaction, such business as making a deed to all his property? A. Well, from a strictly business standpoint I could not say in the affirmative, I don't think he was.

"Q. You don't think he was? A. Not from a business standpoint; no, sir."

Witness said that Mr. Reed was accompanied at the time by his son Sherman or "Golden," and it occurred to him, but he was not positive, that either the father or son asked him for a certificate as to the capability of Mr. Reed for doing business at that time. He did not give any such certificate.

Shortly after this—witness thought it was on the 1st of February—he made a professional visit to de-

ceased at his home in Wilsontown, at which time he found him better than he was when at his office in La Plata. This, however, he attributed to rest, being at home and quiet. The next and last time he visited deceased was on March 8, 1895, during his last sickness, at which time he was called in consultation with Dr. Hanks. He found his condition then weaker, mentally and physically, than when he saw him before.

Upon cross-examination, Dr. Ellis stated that his own memory was not as good as it formerly was, that he was perfectly sensible that his own mind was now upon decay, and that his memory was treacherous; but that a man may have a treacherous memory and still be able to comprehend business propositions.

With reference to the conditions of the mind of Waterman Reed the day witness met him at his office in La Plata, about the last of January or first of February, 1895, and shortly afterwards when he was called to see him at Wilsontown, and also with respect to Mr. Reed's ability to comprehend business propositions and transactions, the testimony of Dr. Ellis, on cross-examination, was as follows:

"Q. Mr. Reed knew you that day, didn't he? A. At first; I don't think he did the last time I seen him.

"Q. I mean the time that he was at your office? A. Yes, sir.

"Q. At La Plata? A. Yes, sir.

"Q. He went there in a conveyance, didn't he? A. I do not know how he came to La Plata; they came into my office and went out. I did not see their conveyance.

"Q. Did you know about his transacting any business in the town there that day? A. No, sir; I do not.

"Q. Well, don't you think, doctor, he had mind enough to know what property he owned that day? A. Well, I entertain doubts as to whether he could give a schedule list of his property.

"Q. I am not talking about that; don't you think

he knew that he had a farm? A. I think he did; yes, sir.

"Q. Don't you think, doctor, that he knew the value of that farm? A. He could approximate it; yes, sir.

"Q. Don't you think he knew who his wife was? A. I think so.

"Q. Don't you think he knew who his children were? A. Yes, sir.

"Q. Don't you think he knew all the objects of his bounty that day? A. Well, he might have.

"Q. Don't you think so? A. I don't know that I think he did.

"Q. You think from your conversation with him, doctor, he knew he owned a farm, you say that? A. Yes, sir.

"Q. You think from your conversation and observation of him that day that he knew his wife was living, don't you? A. Yes, sir.

"Q. From your conversation and observations of him that day he knew he had five children living, did he? A. I think so, yes, sir.

"Q. Then he had considerable mind left, didn't he? A. Well, he had a mind temporarily; sometimes it seemed to be good and sometimes it didn't.

"Q. Well, at times when it seemed good he could grasp any of these subjects I have talked about? A. He could temporarily; yes, sir; I think so.

"Q. Yes, sir; now then, after that you was called to go to his house at Wilsontown shortly after that? A. . I was called shortly after that to go to his house at Wilsontown some time, I think, in the fore part of February; I am not positive.

"Q. In the early part of February? A. Yes, sir.

"Q. 1895? A. Yes, sir.

"Q. Now then, I understand you to say, doctor, that his mind was brighter then than it was on the oc-

198 Sup—24

casion of his visit to you in your office at La Plata? A. He seemed to be a little better than at that visit.

"Q. Do you think upon that day he was capable of comprehending what property he owned? A. He might have.

"Q. Do you think he knew his wife? A. Yes, sir.

"Q. Do you think he knew his children? A. Yes, sir.

"Q. Do you think he knew how many children he had? A. Yes. sir.

"Q. Do you think he knew the relative value of his property? A. I think he could approximate it; yes, sir.

"Q. On this second visit? A. Yes, sir; he could have given the value of his property; it would have been close to its value.

"Q. He could have clearly approximated its correct value? A. Yes, sir."

Tage Howerton, a farmer and a neighbor of the deceased for many years, was asked upon direct examination if he noticed any change in the condition, body and mind of the deceased, in the last year or two prior to his death; to which he replied that he never thought the old man was as bright the last few years of his life as he was before. Witness shipped some cattle to Chicago in November, 1894, and passed the old gentleman up there on that trip; they went together. When asked to explain his condition on that trip he said, he was feeble in body and did not have much to say; he acted like a man that was worn out; that formerly he was a talkative man, but didn't have much to say on that trip; that he went up there to see his son. Witness had bought a lot of cattle of Mr. Reed that fall, and paid him for them before they went to Chicago. After the trip to Chicago, witness did not see deceased any more except a time or two during his last sickness. Had no recollection of seeing him in the month of January, 1895, but from what he saw of him before and after

January 31st, he did not think he was capable of making a deed.

On cross-examination, witness testified that he bought 17 or 18 head of cattle of Mr. Reed, at different prices, in the fall of 1894; that deceased seemed to know what they were worth; that his son Seymore was with deceased at the time, and he referred to Seymore about the price. Witness said he talked to Mr. Reed in 1894 or 1895 about buying part of his farm, but did not make the trade; that he thought deceased had mind enough at the time to understand he owned a farm of 590 acres, but that "he would get into a conversation with you and talk about any subject and say, 'Hold on, I have forgotten; I haven't sense enough to tell anything quite right.' " Witness thought deceased knew his wife and family and knew them well. He thought that if the condition of deceased remained the same or grew worse since the time he accompanied witness to Chicago, up to January 31, 1895, he was not capable of making a deed.

James Johnson, a brother-in-law of one of the plaintiffs, testified that he had known Waterman Reed since 1875. That Mr. Reed was a man of more than ordinary intelligence, who sometimes wrote deeds and gave people advice about business matters. He did not think that Mr. Reed would travel eighteen miles to Edina to have the deeds in question made if he had been in his right mind at the time. The last time witness saw deceased was in November or December, 1894, at which time Mr. Reed lived at Wilsontown and witness about three miles west of there. He heard Mr. Reed was sick, and he called to see him. He found him lying on a cot, and only talked with him a very little; was there only a little while. Witness said Mr. Reed recognized him, passed the time of day, and told him he was sick; that he talked and muttered to himself, and witness thought him physically and mentally weak. He did not think deceased was in a condition to transact

such business as making a deed unless he got better than he was that day.

William Henry testified that he had known Waterman Reed from 1870 until his death, some time in March, 1895. That during the last year or so of his life, witness did not think he was the same man he was a few years before; he seemed to be on the decline. The last time witness ever saw deceased was in January or February, 1895. He noticed a change in Mr. Reed's condition; wasn't near as well as he had been; didn't seem to have as good a mind as he had had; he would start for awhile and talk to you, then stop and commence talking upon something else.

"Q. I will ask you from what you saw of him and heard him talking the way he acted and your observation of him—when did you see him last? A. Well, some time along in January or February.

"Q. Did you see him in January, 1895? A. Well, somewheres along there.

"Q. I will ask you whether, when you saw him at that time, you observed by the way he talked and acted —whether in your opinion he was in a condition of mind to engage in so important a transaction as to make a deed to all his property? A. He never had enough to say to me to form an opinion. I passed the time of day and got a drink of water and asked him how the folks was and went off.

"Q. Did you have any opinion from what you had seen before that? A. He seemed to be all right then when I talked to him, passed the time of day in the conversation; it was not a lengthy conversation."

James Ashby testified for plaintiffs that he was intimately acquainted with Waterman Reed during the last fifteen years of his life. Witness saw deceased for the last time in the late summer or early fall of 1894, at Hurdland. He and deceased belonged to the same lodge, and they were talking in the street about lodge affairs, when deceased said to him: "Jim, I am not as

bright as I used to be in lodge work. I have got too much to see to at home; I can't remember it.'' Then deceased turned from that to something about home affairs, business affairs, and when he did that he broke down and cried, and witness dropped the conversation. Deceased did not mention any domestic trouble, but spoke with reference to his property and stock, and seemed to understand that he owned property that he had to look after. He seemed unable to hold his mind where he wanted it.

Capt. H. R. Parsons, the third party through whom the transfer of the property was made, was defendant's first witness. He testified that he had been acquainted with Waterman Reed as long as he could remember, and had known him intimately since he came to Knox county about the year 1870; that Mr. Reed would be considered rather a bright man, above the average in intelligence. He said it was the custom of Mr. Reed to call on him when in Edina; that he transacted business for him, loaned him money, and witness and Mr. Reed consulted and talked over business matters as two friends would.

Witness testified respecting the transaction as follows:

"Q. Well, now, I will ask you, Captain, coming down—do you remember the circumstances and the occasion of Waterman Reed and his wife coming to your place of business in Edina on the 31st day of January, 1895? A. Yes, sir.

"Q. What was the object of his visit that day? A. To convey his land to his wife.

"Q. How much land did he have? A. 590 acres.

"Q. What did he say about it? A. Well, I couldn't handly remember his exact words, but he said he come there and he wanted to deed his farm to his wife; there was very few words passed about it. He let his business be known and my son fixed up the papers.

Henry, the one that is dead, was a notary public and he drew up the deeds.

"Q. The first deed was by Mr. Reed and wife to you? Yes, sir; he deeded it to me, and then my wife and I deeded it to Mrs. Reed.

"Q. All done at the same time? A. At the same time; yes, sir.

"Q. The deeds were executed in that manner simply to transfer the legal title from him to his wife? A. Yes, sir; that's the object.

"Q. Well, I will ask you now, then, Captain, from your knowledge of him, and from your experience as a business man with him, if he was competent and capable, then and there, that day of comprehending and understanding the nature of the transaction? A. Yes, sir; I think he was.

"Q. He knew what he was doing? A. Yes, sir.

"Q. Was his mind clear and all right? A. I didn't see anything the matter with his mind.

"Q. What was the condition of his mind? A. I didn't notice any difference in his mind from what it had been previously; he was physically weaker, I understand, just recovering from a short spell of sickness. I had heard of him being sick before he come; he seemed to be rather weak physically, but I did not discover anything wrong with his mind.

"Q. Well, now, if there had been anything the matter with his mind don't you think you would have discovered it that day? A. Why, I think likely I would.

"Q. What is your opinion, Captain Parsons, as to whether or not he understood what property he was conveying and to whom he was conveying it and who were the objects of his bounty generally? A. Yes, sir; I think he understood it fully."

On cross-examination, witness said Mr. Reed was accompanied to the bank by his wife and son, Golden Reed, and that neither Mrs. Reed nor Golden made any

suggestion respecting the transfer; that after the deeds were made and executed, Mr. Reed asked witness if his wife could dispose of it in a will, the same as he could have done, and witness replied that he thought she could, and that Mr. Reed then said, she knows how I want it fixed. Witness said that he noticed tears running down Mr. Reed's cheeks, at one time, during his stay in the bank that day. He could not remember any conversation with Mr. Reed wherein the latter asked him to write his will; that either on that day or the next Mr. Reed executed a power of attorney authorizing witness to sell the land.

Dr. James Hanks, introduced by the defendant, testified that he was forty-three years of age, and had been a practicing physician at Brashear for over thirteen years. That he had known Waterman Reed since he, witness, was a boy, and had been his family physician at intervals for several years prior to his death. That during the latter part of Mr. Reed's life he frequently called at the office of witness when in Brashear, and talked with him on literary and other subjects; that he had a mind rather above the average in intelligence. Witness was called to see Mr. Reed, professionally, either in November or December, 1894, for some slight ailment, at his home in Wilsontown. At that time his mind was in a normal condition. Witness also saw him in January, 1895, at which time he had a conversation with him; he never thought of calling his competency in question, and had never heard it questioned; he certainly thought Mr. Reed was at that time competent to engage in a business transaction such as making a deed. Witness had no recollection of any indication of paralysis in Mr. Reed in the month of January; he could use his hands and feet, and didn't think he used a cane or other means of support.

On cross-examination, witness testified that he never discovered any symptoms of paralysis in Waterman Reed until he was called to visit him, in consulta-

tion with Dr. Ellis in the month of March, during his last sickness, at which time he was suffering from partial paralysis caused by hemorrhage or rupture of a blood vessel in the brain, and a blood clot forming there. He understood that Mr. Reed was about seventy-five years of age.

Defendant introduced a number of witnesses, several of them neighbors of deceased, who testified in substance that deceased was weaker physically in January, 1895, than he had been, but that his mind appeared to be as clear as it had been, and that he could understand a business transaction such as the making of a deed to his wife.

At the close of the evidence on the part of defendant, plaintiffs' counsel recalled Capt. H. R. Parsons, who testified that the power of attorney for the sale of said lands was executed by the defendant and her husband the same day the deeds were made; that Waterman Reed was about seventy-five years of age at that time, and his wife a few years younger and in good health. Witness explained that defendant and her husband had five children living in Knox county and vicinity at the time, of whom the plaintiff, Mrs. Chadwell, was the oldest; the plaintiff, Mrs. Decker, the next oldest; A. S. (Golden) Reed, the next oldest; plaintiff Seymore Reed, the next, and Mrs. Gonnerman, the youngest. Witness said the land in question was worth from $10 to $12, or possibly $15, an acre at the time the deeds were made, and that said land was now worth from $20 to $25 an acre; that said land was substantially all the property Mr. Reed owned at the time, except some stock he had upon the farm, which was sold after his death for about $800, and the proceeds, after the payment of debts, turned over to Mrs. Reed. He also stated that the deed of trust for $2,850 was renewed by Mrs. Reed since her husband's death for the same amount.

S. R. Durham, then introduced by plaintiffs' coun-

sel as a witness, testified that in the spring or fore part of the summer of 1895 he was working in a lumber yard at Brashear, at which time he saw Waterman Reed fall down there, apparently lifeless, but that he came to in a short time after being picked up and carried to a room. Witness insisted that the occurrence was in the year 1895.

The power of attorney executed by the defendant and her husband appointing Henry R. Parsons their attorney in fact to sell said land, was then introduced and read in evidence, over the objection and exception of defendant, and it was afterwards agreed that the said instrument be submitted to the inspection of the appellate court and filed with the record, which was done.

Over the objections and exceptions of defendant, the court instructed the jury as follows:

"2. The nature of the transaction; the fairness or unfairness to those entitled to the bounty and recognition of deceased in the disposing of his property; the amount of the estate conveyed to his wife, and whether or not it was more than was required for her future support and maintenance, you may consider in passing upon the question of condition of deceased's mind; deceased had a right to make such disposition of his property as he saw proper, and you cannot find for plaintiffs because he made, in your opinion, an unfair disposition of it. You can only consider such fact, if you find it exists, in passing upon the question of the condition of his mind.

"3. In passing upon the question of condition of the mind of deceased, you should take into consideration all the facts and circumstances proven, and all the evidence given in the case, save the evidence of the witness, plaintiff S. J. Reed, which you will disregard and not consider in the forming of your opinion, the court being of the opinion he was an incompetent wit-

ness under the law, and should not have been permitted to testify.

"4. The court instructs the jury, that if you find from the greater weight of the evidence in the cause that the deceased, on the date, January 31st, A. D. 1895, when he made the deed referred to in evidence was suffering from such imbecility and derangement of mind, as to be unable to comprehend and understand the effect and consequences of the act of making the deed, then it will be the duty of the jury to find the issues for the plaintiffs, and answer the interrogatory Yes."

The court, at the request of defendant's counsel, gave to the jury the following instructions:

"5. The court instructs the jury that the sole question for their consideration is, did Waterman Reed, at the time of the execution of the deeds in question conveying said lands to his wife Ruth Reed, understand the nature and effect of the transaction in which he was engaged? And if the jury shall believe and find from the evidence in the cause that the said Waterman Reed did understand the transaction and business in which he was engaged when he made said deeds, then your answer to the first interrogatory should be No.

"6. The court instructs the jury, that before you can answer the first interrogatory Yes, you must be satisfied from the greater weight of the evidence in the cause that the deceased did not have mind sufficient to understand the nature, character and effect of the deed he executed to his wife on January 31, 1895, and unless you so find from the evidence you will answer the interrogatory No."

The jury returned a verdict to the effect that Waterman Reed was not, at the time of the execution of the deed in question, of sound mind, and in such condition of mind as to render him capable of executing said deed, understanding its nature and effect, the

property he was disposing of and the disposition he was making of it by said deed.

In due time defendant filed a motion to set aside the verdict and for a new trial, which was overruled, and defendant excepted. Judgment was then rendered by the court setting aside said deeds, and for costs against the defendant. She appeals.

The only issue presented to the jury was as to whether Waterman Reed was, at the time of the execution of the deed by him and his wife, the defendant, to H. R. Parsons, mentally capable of making it. The presumption is that all men are sane, and it devolves upon those who assert the contrary to prove it by a preponderance of, or the weight of, the testimony, and the mere fact that said deed was executed for the primary purpose of vesting the title to the property thereby conveyed in the grantor's wife, the defendant in this action, raises no presumption of his incapacity to make the deed.    A party claiming under a deed is not bound to prove the sanity of the person making it, but the burden of proving the unsoundness of mind and incapacity of the grantor, at the time of its execution, rests with the party seeking to impeach it. [Dicken v. Johnson, 7 Ga. 484; Howe v. Howe, 99 Mass. 88; Brown v. Brown, 39 Mich. 792; Chancellor v. Donnell, 95 Ala. 342; Gibbons v. Dunn, 46 Mich. 146; Kimball v. Cuddy, 117 Ill. 213; Buckey v. Buckey, 38 W. Va. 168; Anderson v. Crammer, 11 W. Va. 562; Jarrett v. Jarrett, 11 W. Va. 584; Greenslade v. Dare, 20 Beav. 284; Doe dem Guest v. Beeson, 2 Houst. (Del.) 246; Odom v. Riddick, 104 N. C. 516; Cropp v. Cropp, 88 Va. 753.]

There is no question of undue influence in this case, but the question solely is whether Waterman Reed had sufficient mental capacity to make the deed at the time it was executed. The legal test is the capacity of the grantor to understand the nature and effect of the transaction. ''If a person understands the nature of the business in which he is engaged and the

effect of what he is doing, his acts are valid, and this is true though the mind of such person may be impaired by age or disease." [Cutler v. Zollinger, 117 Mo. 92; 1 Parsons on Contracts (7 Ed.), 383; McKissock v. Groom, 148 Mo. 459.]

Dr. Ellis was the chief witness for plaintiffs. He testified substantially that in the last week in January, or the first week in February, 1895, Mr. Reed, accompanied by his son, "Golden," called upon him at his office in La Plata, in connection with the contemplated execution by him of a deed or will, and tried to explain the nature of the transaction, but failed; that Mr. Reed was then in an advanced state of paralysis of body and mind, could not talk plainly, connectedly or correctly, nor protrude his tongue in a straight line, and that the corner of one eye was drawn down. Witness being asked if, from his observation and examination of Mr. Reed there that day, and hearing what he said to him, he thought he, Reed, was in a condition to engage in a business transaction such as the making of a deed to all his property, he answered: "From a strictly business standpoint, I could not say in the affirmative; I don't think he was." The incidents mentioned by plaintiffs' lay witness were of a very trivial character, and did not justify the conclusion that Mr. Reed, although aged and infirm, did not know the nature and effect of the transaction in which he was engaged when he executed the deed. Upon the other hand, Dr. Hanks, who knew deceased intimately, and had been his family physician at intervals for several years prior to his death, saw him in his office the latter part of January, 1895, and had a conversation with him, testified that the mind of Mr. Reed was as he had formerly observed it; that he never thought of calling his competency in question, and that he never heard any question as to his noncompetency spoken of at that time. Witness also testified that he certainly thought Mr. Reed was competent at that time to engage in a transaction such as making a

deed; that when he saw him at that time he did not seem to be afflicted with paralysis, but used his hands and feet well. On cross-examination this witness testified that he never discovered any symptoms or indications of paralysis in deceased until he was called to visit him, in conjunction with Dr. Ellis, during his last sickness in the month of March, at which time he discovered that he was afflicted with a clot on the brain, or transfusion of blood.

Captain H. R. Parsons, a banker, testified for the defendant that he had known deceased intimately for twenty-five years, and that he was a bright man, above the average in intelligence; that on the day the deeds in question were executed deceased came into his bank and told him that he wanted to convey his land to his wife, and asked him if it could not be done, and he advised him that it could; that the deeds were made accordingly; that the deceased was competent and capable, then and there, of comprehending and understanding the nature of the transaction; that he knew what he was doing, and that nothing appeared to be the matter with his mind. Other witnesses, neighbors and acquaintances of deceased, also testified to his knowledge of his own affairs—stock, land, and business matters.

The evidence on the part of plaintiffs falls far short of showing that deceased did not know the na-. ture of the business in which he was engaged and the effect of what he was doing. The question is not as to whether the deed was procured by Mrs. Reed, with the understanding that she was to make another to their children, but whether her husband, Waterman Reed, was in such a condition of mind, at the time, as to render him capable of understanding and comprehending the nature, character and effect of the transaction; and the evidence, we think, clearly and unquestionably shows that he was. We cannot presume that Mrs. Reed will, in the end, deal unfairly or unjustly with her children. Upon the contrary, were it permis-

sible to indulge in presumptions at all, we would prefer to presume that her motherly instincts would prompt her to do justice between them. After the deeds to the land were executed, Mr. Reed inquired of Capt. Parsons if Mrs. Reed could make a will or dispose of the land "the same as he could," and being informed, by Capt. Parsons that she could, deceased remarked, "She knows how I want it fixed," thus showing, by implication at least, that she would dispose of the land in accordance with his known wishes. But even if we knew that she would not deal fairly with her children in this respect, that could not in any way affect the question as to the mental capacity of deceased to make the deed. While the verdict of the jury was that Mr. Reed did not have sufficient understanding and mental capacity to make said deed, it was merely advisory and of no binding force or effect.

"A grantor in a deed may be extremely old, his understanding, memory and mind enfeebled and weakened by age, and his actions occasionally strange and eccentric, and he may not be able to transact many affairs of life; yet if age has not rendered him inbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character, and effect of the particular act, that is sufficient to sustain it." [Buckey v. Buckey, 38 W. Va. 168.]

In Studybaker v. Cofield, 159 Mo. 396, VALLIANT, J., speaking for the court, said:

"On the proposition that Joseph Boyer had not sufficient mental capacity to make a deed, the plaintiffs' evidence was weak and was entirely overcome by the testimony of the defendants. The incidents mentioned by the plaintiffs' lay witness were trivial and did not justify the conclusion that the old man was more whimsical or childish than men of his age ordinarily are. The hypothetical question propounded to the learned witnesses brought answers that indicated that there

might, in the opinion of the experts, be doubt as to the sanity of the man hypothetically described. But in the face of the clear and intelligent testimony of the physician who attended him, and of the lawyer who was present when the deed was made, and of the neighbor, Hill, who called to see him the next day, when, as his physician testified, he was weaker than on the day the deed was made, that doubt was entirely removed.'' [McKissock v. Groom, 148 Mo. 459.]

That the deceased had the right, under the circumstances disclosed by the record in this case, to dispose of his property as he thought proper, there can be no question. As was said by MARSHALL, J., in Richardson v. Smart, 152 Mo. 623, ''The sum of the whole matter is that it was his property. He had a right to do what he pleased with it. He is not shown by this record to have been incapable of knowing what he was doing. He has acted, and what was said in reference to a will by the Supreme Court of Michigan applies equally as well here: 'If a man's act, by reason of such incidents as have been shown in this case, make such acts the subject of post-mortem determination, dependent upon the whims or caprice of a jury, then it may well be said by him who wishes to convey his property, ''I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.'' ' ''

We have looked in vain through the record for some evidence tending to show that Waterman Reed, at the time of the execution of the deed by him and his wife, defendant herein, to Capt. Parsons, was not of sound mind and in such condition of mind as to render him capable of making the deed, and understanding its nature and effect, nor is such evidence to be found in the record.

Our conclusion is that there was no evidence to justify the verdict of the jury, or upon which to base

the judgment of the court. The judgment should, therefore, be reversed. It is so ordered.

All concur.