MARY JONES, Appellant, v. ALMA THOMAS et al.

Division One, March 31, 1909.

1. CONFIDENTIAL RELATION: Burden of Proof: Unsound Mind. Where a relation of trust and confidence existed between the grantor and the grantee in a deed of gift, and plaintiffs, his other children, seek to have the deed set aside on the ground of the grantor's incapacity, and on the ground of undue influence exercised by defendant, the burden of proof shifts from plaintiffs to defendant to show that the grantor was of sound mind, capable of making a deed, and that the deed made by him was his free act, uninfluenced by any improper conduct on defendant's part.

2. ———: How Shown. But evidence of the extreme age of the grantor, that he was in an enfeebled condition, that he made an unequal division of his property among his children, that at the time of making the deed he resided with the son who is the grantee and who by the deed received more than an equal share of his estate, and that he had resided with him since the death of his wife two years previously, are alone not sufficient to show a relation of trust and confidence. The evidence should go further and show that the son had charge and control of the grantor, and that he cared for and ministered to his health, comfort, wants and necessities, or that he had charge of and conducted the grantor's business, or that some such relation existed between them as showed the grantor actually reposed trust and confidence in the son.

3. CAPACITY TO MAKE DEED: Deed of Gift: Will and Contract. The law ordinarily requires a higher degree of mentality to make a contract than it does to make a will. That is true where the contract is dual in character, operating in the exchange of values, and the grantor must compete in an intellectual struggle with the grantee. But where the deed is not for that exchange of values implied in the ordinary conveyance of real estate, but is intended by the grantor as a gift to a son, in consideration of love and affection, which is the basis of most wills, no higher degree of intelligence is required of the grantor to make the deed than is required of him to make a valid will.

4. APPELLATE PRACTICE: Equity Case: Preponderance of Evidence: Suit to Set Aside Deed: Incapacity. The appellate court has the right to review and weigh anew the evidence in an equity case, but the usual practice is for the court to defer largely to the findings of the chancellor on all issues of fact,

and to refuse to disturb the judgment on the ground that the findings are against the weight of the evidence. And where, in plaintiff's suit to set aside a grantor's deed to his son on the ground that he was of unsound mind and incapacitated to make a deed, the grantor, if plaintiff's evidence is true, was not only of unsound mind, but almost an imbecile, scarcely conscious of his own existence, and therefore not capable of making a valid deed of gift, and, if defendant's testimony is true, he was perfectly sound in mind and fully comprehended what he was doing, the appellate court will not interfere with the chancellor's finding to the effect that he was not incapacitated to make the deed; especially, where the great weight of the testimony of the disinterested witnesses and of those who bear a close family relationship to him supports that finding.

5. MENTAL CAPACITY: Legal Presumption: Burden. The law presumes that the grantor in a deed of gift to his son was of sound mind when he made the deed, and the burden of disproving that fact rests upon him who seeks to have the deed set aside on the ground of his incapacity—no relation of trust or confidence being shown.

6. ————: Undue Influence: Evidence of Prior Intention. Testimony of disinterested witnesses that the grantor had stated to them on occasions running back as far as ten years before the deeds were made that he intended to give to the sons the property which he afterwards deeded to them, is competent in a suit to set the deeds aside as being the result of incapacity and undue influence, as showing a fixed and definite purpose of long standing to convey the property in the way he did.

7. EQUITY CASE: Improperly Excluded Evidence: Affirmance Nevertheless. Testimony as to alleged declarations of the grantor, tending to show improper acts and conduct on the part of the grantee and certain members of his family, was admissible as tending to show the grantor's mental condition and the state of his affections, and was improperly excluded in the suit to set the deed aside on the grounds of his incapacity. But the case being a suit in equity and the proffered evidence being preserved, the appellate court will consider it admitted, yet if when so considered it does not overcome the great weight of the evidence preponderating in respondents' favor and the results reached by the circuit court could not and should not be altered thereby, its exclusion was not reversible error, and the judgment will be affirmed.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald*, Judge.

AFFIRMED.

*Bond, Marshall & Bond, Charles H. Walton* and *L. Frank Ottofy* for appellant.

(1)   The relation of trust and confidence existed between the grantor and the grantees in the deeds here in controversy, and the burden of proof is on defendants.   Ennis v. Burnham, 159 Mo. 518; Martin v. Baker, 139 Mo. 504; Kirschner v. Kirschner, 113 Mo. 297; Cadwallader v. West, 48 Mo. 483; Yosti v. Laughran, 49 Mo. 594; Street v. Goss, 62 Mo. 226; McClure v. Lewis, 72 Mo. 314; Bogie v. Nolan, 96 Mo. 98; Kroenung v. Goehri, 112 Mo. 641; Erhart v. Dietrich, 118 Mo. 430; Boggess v. Boggess, 127 Mo. 305; Weston v. Hanson, 111 S. W. 44.   This is an exception to the general rule as to the burden of proof.   Tibbe v. Kamp, 154 Mo. 580.   (2)   There is a marked difference between the capacity to make a deed or contract *inter vivos,* and that required to make a will.   Ennis v. Burnham, 159 Mo. 518; Kirschner v. Kirschner, 113 Mo. 297; Weston v. Hanson, 111 S. W. 50.   (3)   Mental capacity, undue influence, relation of trust and confidence, definitions and examples.   Boggess v. Boggess, 127 Mo. 312; Kroenung v. Goehri, 112 Mo. 641; Bogie v. Nolan, 96 Mo. 98; McClure v. Lewis, 72 Mo. 314; Street v. Goss, 62 Mo. 226; Yosti v. Laughran, 49 Mo. 594; Cadwallader v. West, 48 Mo. 483; Miller v. Miller, 187 Pa. St. 572; Jones v. Simpson, 171 Mass. 474.   (4) Defendants stood in a relation of trust and confidence towards W. O. Thomas, and exercised an undue influence over him.   (5)   W. O. Thomas had not legal or mental capacity to make the deeds.   (6)   ''The thing itself speaks.''   The division of his property was so unnatural and unreasonable as to show that he was not capable of understanding what he was doing, and establishes that it was the product of the undue influence of defendants.   (7)   The trial court erred in admitting conversations as to intended disposition of his property, that took place ten years before the deeds

were made.  Tingley v. Cowgill, 48 Mo. 298; Gibson v. Gibson, 24 Mo. 227.  (8)  The trial court erred in not allowing plaintiff to show his feelings towards his children.  Tibbe v. Kamp, 154 Mo. 575.  (9)  The fact that defendants did not produce the original will is a circumstance casting great suspicion upon the validity of the deeds and later will.  (10)  The reason given by defendants for the making of the deeds, to-wit, that Alma could not wait two years until the estate was administered upon, is not only too improbable to be believed, but, even if true, would not show any motive for making the deed to Thomas, who was established in business, and who could wait until that time.  (11) There is no disinterested evidence to support the judgment; even if there is a conflict of testimony, the burden of proof is upon defendants, and the preponderance of the evidence is not in their favor, but shows a clear right of recovery by plaintiff.

*Rassieur, Schnurmacher & Rassieur* for respondents.

(1)  Whether the grantor possessed mental capacity sufficient to enable him to make the deeds should be determined by the rule applicable to wills—not by the rule applicable to contracts.  The deeds in controversy were made as gifts, not as contracts.  Chadwell v. Reed, 198 Mo. 359; Richardson v. Smart, 152 Mo. 623.  (2)  The preponderance of the evidence shows that the grantor was of sound mind at the time of the execution of the deeds in controversy.  Maddox v. Maddox, 114 Mo. 42; Sehr v. Lindemann, 153 Mo. 288; Riggin v. Westminster College, 160 Mo. 579; Wood v. Carpenter, 166 Mo. 481; Crossan v. Crossan, 169 Mo. 640; Crowson v. Crowson, 172 Mo. 700; Hamon v. Hamon, 180 Mo. 685; Story v. Story, 188 Mo. 127; Chadwell v. Reed, supra.  (3)  Also that no undue influence was exerted by any one to bring about the execution of the deeds.

Tibbe v. Kamp, 154 Mo. 579; Studybaker v. Cofield, 159 Mo. 596; Kischman v. Scott, 166 Mo. 227; Aylward v. Briggs, 145 Mo. 613; Thompson v. Ish, 99 Mo. 182; Campbell v. Carlisle, 162 Mo. 647; Doherty v. Gilmore, 136 Mo. 419. (4) The testimony of the witness Roberts, to the effect that the giving of the property to the sons was in accordance with the plan which the grantor had cherished for many years, was competent. Teckenbrock v. McLaughlin, 209 Mo. 533; Wood v. Carpenter, 166 Mo. 465; Thompson v. Ish, 99 Mo. 171. (5) Even if this testimony were ruled out altogether, it could not affect the merits of the controversy and the decree would still be supported by the great weight of the evidence. (6) There is no proof that a confidential relation existed between the grantor and the grantees, and the burden of proof was upon plaintiff. Studybaker v. Cofield, 159 Mo. 596; Campbell v. Carlisle, 162 Mo. 634; Doherty v. Gilmore, 136 Mo. 414; Teckenbrock v. McLaughlin, 209 Mo. 533. (7) But even if it should be ruled that the burden should rest upon the defendants, we still maintain that the preponderance of the evidence justifies the decree in their favor. (8) When the evidence is conflicting, as in this case, the appellate court should defer to the findings of the chancellor. Tinker v. Kier, 195 Mo. 183. (9) The evidence introduced by plaintiff of alleged declarations of the grantor, tending to show improper acts on the part of his son Thomas, and his family, was admissible only on the issue as to the grantor's mental capacity and to show the state of his affections; these alleged declarations had no probative force to establish undue influence. Teckenbrock v. McLaughlin, 209 Mo. 533; Schierbaum v. Schemme, 157 Mo. 1; Crowson v. Crowson, 172 Mo. 702; Seibert v. Hatcher, 205 Mo. 83.

WOODSON, J.—Mary Jones, the plaintiff, a daughter of William O. Thomas, deceased, brought this suit in the circuit court of the city of St. Louis, to set

aside two deeds conveying certain real estate, situated in said city, to his two sons, Thomas and Alma Thomas, executed March 16th, 1901.  A trial was had before the court, which resulted in a finding of facts and a rendition of judgment in favor of the defendants.  The court having refused to grant a new trial, the plaintiff duly appealed the cause to this court.

The trial consumed several days, during which time many witnesses were introduced and examined by both plaintiff and defendants.  Their testimony covers more than five hundred and fifty printed pages.

There are no close or complicated legal propositions involved in the case, but it turns almost exclusively upon questions of fact; and, as the testimony introduced by the respective parties is so sharply contradictory, it will require a somewhat extensive statement of the substance thereof in order that we may properly determine with which party the preponderance of the evidence abides.  Counsel for both plaintiff and defendants have presented a most excellent abstract of the record and a statement of their respective theories of the case, which greatly shortens and facilitates the work of this court; and as there is no material difference in the substance of the two, we will copy largely from both in making up this statement, and thereby present a full statement of the substance of the testimony which we are requested to review.

William O. Thomas, the father of plaintiff and defendants, was in his eighty-second year at the time he executed the deeds in question, which was on March 16, 1901.  His wife, his third, was accidentally killed in the month of September, 1899, and his next of kin were the plaintiff and defendants, and William, David, John, Arthur, Lillie and Daisy, children of a deceased son, John Thomas.

His property consisted chiefly of a track of land fronting on Manchester Avenue, in Cheltenham, a subdivision of the city of St. Louis, upon which was located his residence and several other small buildings, which he rented to various tenants for seven or eight dollars a month, aggregating about $160 per month.

On March 16, 1901, William O. Thomas executed the deeds before mentioned to his sons, Alma and Thomas. On the 28th of the same month he executed his will, wherein he devised part of his remaining property to plaintiff for life, with remainder to her children, a small tract to the bishop of his church, and all of the remainder to his grandchildren above named. The will also contained a residuary clause, making his children and grandchildren residuary legatees, the grandchildren to take *per stirpes*.

William O. Thomas departed this life September 6, 1901, and this suit was instituted July 3, 1903.

The plaintiff contends that her father was of unsound mind at the time of the execution of the deeds in question, and that he was incapable of understanding or knowing what he was doing; also that defendants, knowing their father was of weak mind and easily influenced, conspired together and through fraud and undue influence induced him to make the conveyances, to the injury and loss to plaintiff and the other heirs of said William O. Thomas, to a large portion of his estate. The defense is a general denial; and the questions of fact presented are:

First. Was William O. Thomas of unsound mind on March 16, 1901, at the time of the execution and delivery of said deeds?

Second. Was the execution of the deeds the result of fraud and undue influence perpetrated upon him by the defendants?

As before stated, the evidence disclosed by this record tending to prove and disprove those issues comes from the mouths of many witnesses and is vol-

uminous and conflicting, and is substantially as here-inafter stated, as appears from appellant's abstract and the statements of the parties.

At that time William O. Thomas owned the following lots of land in the city of St. Louis; of the values stated, to-wit:

A.   Lot fronting 179 feet on north side Manchester Avenue, City Block 4007, value $8,675, (deeded to Alma Thomas, March 16, 1901).

B.   Lot fronting 632 feet and 6 inches on north side Manchester Avenue, City Block 4007, (deeded to Thomas Thomas, March 16, 1901), value $12,496. The value of these lots is $21,600, exclusive of the buildings thereon, which are worth $10,700.

C.   House No. 5729 Manchester Avenue, lot 47 by 100 feet, (devised to Reorganized Church of Jesus Christ or Latter Day Saints), value $2,350.

D.   House 5725 Manchester Avenue, lot 18 by 100 feet, value $1,500, (devised to Lillie Mason, his grand-daughter).

E.   House No. 5723 Manchester Avenue, lot 27 by 100 feet, value $1,500, (devised to Arthur Thomas, his grandson).

F.   House No. 5719 Manchester Avenue, lot 30 feet 9 inches by 100 feet, value $4,500, (devised to John Thomas, his grandson).

G.   Houses Nos. 5713 and 5715 Manchester Avenue, lot 54 by 100 feet, value $4,700, (devised to Daisy Thomas, his granddaughter).

H.   House in rear of property devised to Daisy Thomas; lot 16 and 166, value —— (devised to William Thomas, his grandson).

I.   House in rear of property devised to Daisy Thomas, lot 30 by 166 feet, value —— (devised to David Thomas, his grandson).

J.   Lots 5 and 6 in Crabster's Subdivision, fronting 144 feet on Manchester Avenue, value $4,527, (devised to Mary Jones, his daughter).

This latter property is subject to leases to H. W. Beck Feed & Seed Company, and H. W. Beck, the first covering 46 feet, rental $115 per annum until June 1, 1933, and $138 per annum until May 31, 1953, and the other covering 80 feet, rental $150 per annum until 1912, and $225 per annum thereafter until March 1, 1952; the lessor to pay the taxes assessed against the land, and the lessee those assessed against the improvements.

His personal property consisted of three worthless notes, aggregating $337.50, goods and chattels worth $133.75, and cash $1,315, all of which was consumed in the administration of the estate.

On March 16, 1901, W. O. Thomas deeded the two parcels numbered A. and B. aforesaid, having an aggregate front of 811 feet and 6 inches, and of the value of $21,600, exclusive of the improvements thereon (worth $10,700) to his two sons, Alma Thomas and Thomas Thomas, the expressed consideration being love and affection and $10 from each.

Immediately after the death of William Thomas's wife, on September 26, 1899, Thomas Thomas, with his family, moved into his father's house, and took possession of it, and continued to occupy and run it, and has done so ever since, and made his father pay $8.50 per week for board for himself and his granddaughter, Daisy Thomas, and later he paid all the expenses of the house. He also agreed to pay Tommie $100 a month to take care of him.

W. O. Thomas, before he began to fail, was an intelligent, educated and strong-minded man, knew what he was doing, a good instructor, treasurer of the church, was very close in money matters, "had a head of his own," and could not be easily influenced, and had accumulated considerable property. After his wife's death "you could do whatever you wanted to do with him." About a year before his wife's death he began to fail. He was very much affected by his

wife's death, and developed the following symptoms and was guilty of the following acts:

Acted like a man that had lost his mind—more and more each day; did not recognize his daughter, the plaintiff, when she went to see him, from about March, 1900, up to his death; thought he was not in his own house, and continually wanted to go away; so much so that the defendants, Thomas Thomas, Annie Thomas and Daisy Thomas, kept him locked in the house, hid his clothes and let him have only his drawers, undershirt and cap; escaped from the house, stopped people on the street and asked them to help him; ran into the fields and up into the weeds, and hollered for help; crawled on his hands and knees; thought he was in Wales, where he had not been for fifty years, and had seen his mother and his relatives; thought he had been in Kirkwood and had seen "very funny people there," when he had not been in Kirkwood.

His mind wandered and he could not carry on a connected conversation on any subject, talked foolishly; did not know his children, grandchildren or relatives or friends when he saw them; could not understand or attend to business for a year before his death; could not count money; would not take the rents amounting to $500 when they were paid to him; said he had no money and asked others for a penny or a nickel, when he had money in bank; after November 14, 1900, he could not sign rent receipts and even before that Daisy generally signed them; had a piece of newspaper hid in the band of his drawers, and thought it was a hundred dollars; thought the defendant Thomas Thomas and his family were going to kill him; wanted to get away from his house and live somewhere else; thought he was in prison, and that the window screens were prison bars; said they (meaning the defendants) had robbed him; and "they bother me and done wrong with me." After his wife's death, said he was going to change his will, and when reminded that he had prom-

ised his wife not to do so, replied, "Yes, but Tommie (meaning defendant Thomas Thomas) makes me," and when advised not to do so, said, "Might he kill me if I didn't do it?" Wanted to marry his granddaughter, Daisy Thomas, and asked her mother's consent; also wanted to marry Mrs. Remington and Mrs. Schenten and Mrs. Hamilton; when asked why he made the deeds (in controversy here) said "he had to"; that the boys made him do it; that he asked his son to give the property back to him and he refused; wanted his son-in-law David Jones to go to court with him and he would give him everything he had; had been a regular attendant at church, and was the treasurer, but for the last year of his life only went to church twice and had to be assisted in doing so. The defendants kept him in a room with the doors and windows locked and fastened, and prior to the execution of the deeds in question here, would not allow anyone to see him unless some of them were present.

Dr. Dixon testified: For over a year prior to, and at the time of, executing the deeds in controversy he was suffering with senile démentia, and was wholly unable to understand what he was doing, or what property he owned, or the nature of a business transaction. He grew worse all the time and was not rational in January or February, 1901. He was suffering with "an atrophic condition of the brain." When one has senile dementia, he has no lucid intervals of sufficient duration to enable him to transact any extended business.

Testimony of Dr. Edward F. Brady: Senile dementia means "mental degradation, the lowering of the powers of the mind until they become practically abolished." If W. O. Thomas went out on the street hollering for help, undressed himself in public, and did the other acts described by plaintiff's witnesses, "he was undoubtedly in a condition which was commonly termed the third degree of dementia, incomprehen-

sive," and was incapable of attending to any business. In the final degree of dementia "the powers keep dwindling and growing less and less until even conscience and power is lost, and the individual then exists as such of the vegetable organism." That he had been suffering with chronic nephritis (a kidney disease) for several years, and had been treated for it four or five years. The immediate cause of his death was uremia.

Testimony of Mary Jones: W. O. Thomas thought his daughter-in-law, the defendant, Annie Thomas, was a Mrs. Miner. W. O. Thomas said, "Thomas Thomas and his wife wants me to go down to the basement to live." He said he was only a boarder in the house. The defendants declared him of unsound mind prior to the execution of the deeds. Annie Thomas said to plaintiff: "Oh, my; we can't do nothing with your father, we tried to convince him to go into the parlor to show him his 'wife's picture, and he didn't know—he wanted to go—he thought he wasn't at home; he wanted to be going." When plaintiff asked them why they kept the doors locked, they answered, "Well, you know your father ain't right, and we have to keep the place locked." They put a piece of paper about eighteen inches square, with a black spot in the middle of it, like a target, on the door of his room, and Annie Thomas said it was so that Mr. Thomas "could find his location," when he sat up in bed. The defendant, Annie Thomas, said they had to hide his clothes to keep him in the house. Alma asked Mrs. Remington to take Mr. Thomas and give him a home for a few days, saying, "Them people over there just treat him terrible." Thomas Thomas said, "I think it is time you were getting a new treasurer for the church." He was treasurer until February 25, 1901. Thomas Thomas said: "Everybody knows father isn't able to run his own business"—"I am running his business now." Annie Thomas took the rent 'which Mrs. Rem-

ington paid and got the change, and when asked why she did not let Mr. Thomas make the change, she said, "He ain't responsible—he can't." When Mr. Thomas wanted to go to Mrs. Fairfax's house, Annie Thomas (and Daisy) said, "Don't notice what he says; he don't know what he is talking about." When Annie and Daisy Thomas were sitting in the front hall sewing, Mr. Thomas came out of his room, with only his night drawers on, crawling on his hands and knees; Daisy was barefooted and "she stuck her big toe in his mouth." When he was locked in the house, Annie Thomas said "he had not been right all that year."

## Defendant's Testimony.

Luther Babcock testified that he had been in business in St. Louis for many years as an abstractor of titles and conveyancer; that he had known W. O. Thomas for twenty years and had attended to business for him more or less every year during that entire period. He drew the leases to the Becks and the renewal lease; he drew the deeds and the will of March, 1901. He had never transacted any business for Thomas Thomas prior to the services in connection with administration upon his father's estate. When the leases were drawn, and when the renewal leases were drawn, Mr. Babcock got his instructions from Mr. W. O. Thomas and from him alone. He did not get to see Mr. Beck until the leases were ready for execution, when he came to the office with Mr. Thomas. When the will of October, 1900, was drawn, Mr. W. O. Thomas came to his office and gave him the instructions in regard to the same— no one else. About March 14, 1901, Thomas Thomas came to his office and informed him that his father wanted to make him a deed for part of the Cheltenham property, and Alma a deed for another part, and he explained what parcels he wanted to convey. Mr. Babcock said he would prepare the deeds and be out the

next day. With this explanation, and referring to plat
books in his office, he made up the description and pre-
pared the deeds and called on the old gentleman at his
residence on March 15th. While Mr. Thomas was en-
gaged in reading the deeds, Mr. Babcock examined a
plat of a survey of the property, hanging on the wall
of the room. He noticed that this survey was some-
what different from the plat at his office, and that his
descriptions in the deeds were not accurate, and he
explained the matter to Mr. Thomas and promised to
call the next day with the corrected deeds. Mr. Thomas
told him that this property which he was deeding to
the boys was the same which he had given them in his
will. He said he wanted to give them the property
now so that they will not be hindered in any way during
administration. The next day Mr. Babcock called with
the corrected deeds, and explained the corrections, and
Mr. Thomas read the deeds and executed them, and Mr.
Babcock, as a notary public, took his acknowledgment
and left the deeds with him. At this time Mr. Thomas
turned over the old will to him and said he wanted him
to change it so as to cut out the property which had
been conveyed to Alma and Tommie. He even told him
he wanted it typewritten so that he could better read it.
Mr. Babcock took it along and rewrote the will as
directed. On March 28, 1901, he called there to have it
executed. Thomas Thomas was there and he was sent
out to get a witness, and soon thereafter returned with
Dr. Murphy. Mr. Thomas read the will and then the
will was signed by him and attested by the subscribing
witnesses, with the usual ceremony accompanying at-
testation. This will was precisely the same as the pre-
vious will, the will of October, 1900, except that the old
will devised to the boys the property which the father
had just conveyed to them by deed. Witness never
conversed with Thomas Thomas regarding the deeds
except on the occasion above stated, and he never con-
versed with Alma; Mr. Thomas paid Mr. Babcock for

the deeds on the day when they were executed, and for the will on the day when it was executed. He had the money about his person. Mr. Babcock further testified that Mr. Thomas was of sound mind on March 28, 1901, when the will was executed, and on all previous occasions when he saw him.

Dr. Robert Brent Murphy testified that he has been engaged in the practice of medicine since 1889. His office is located about four blocks from the Thomas residence and he knew Mr. Thomas for about ten years, and was his family physician during that period. Mr. Thomas's particular trouble was nephritis, a kidney disease. He was also bothered with indigestion and a chronic constipation. He used to get attacks of paroxysms in his abdomen. He would have a severe attack, then it would pass off and he might not have another for a month or longer. These attacks were symptoms of the nephritis; they were not in any way indicative of senile dementia. Mr. Thomas never had senile dementia or any of the symptoms of that disease. Witness saw him and prescribed for him in 1900—on January 5, April 28, May 2, August 2, November 26, December 14; in 1901, on January 26, March 14, 15, 16, 18, 28; April 1, 2, 3, 4, 5, 6, 7, 26; May 21, 26, 29, 31; June 4, 7, 28; July 15 and September 1, 5 and 6. On July 15 he noticed for the first time that the nephritis had progressed to such an extent that uremia had begun to manifest itself; he began to show the signs of a poisoning of the system, caused by the improper action of the kidneys; his mind was not as active as it had been; he was drowsy, but he was still capable of transacting his business and of appreciating his affairs. The witness did not see him again until September 1st, and again on the 5th and 6th. On September 1st the uremia had progressed to such an extent that he would not have been able to transact business. Prior to the September visit the witness was always able to carry on conver-

sations with Mr. Thomas; he would get from him the information as to his condition, the character of the pains, the effect of the medicine, etc. Mr. Thomas usually paid him for each visit unless he knew he was to come back and then he would pay him for the several visits at one time.

On cross-examination he was asked what he would think of William O. Thomas if he had been found out in the fields, crying for help; if he crawled around on his hands and knees; if he imagined he was in Wales or in Kirkwood and imagined he saw "funny" people; if he was unable to recognize his own children; if he wanted to marry his niece, etc., and he answered that any man guilty of such irrational acts was certainly crazy.

He also stated that when a man suffers from uremia he is apt to do irrational acts—but he stated there was no indication of uremia as late as June 28th; he first observed manifestations of uremia upon his next visit, July 15th, but there was never any indication of senile dementia or other mental derangement.

He was also asked on cross-examination, whether a man could not have nephritis and senile dementia at the same time, and he answered that he might have, just as he might have pneumonia, smallpox and other diseases at the same time—but Mr. Thomas was not so afflicted.

Dr. Murphy also testified that on March 28th, while he was on his way down to the Thomas residence, he met Tommie Thomas, who said that he was wanted at the house. There Mr. William O. Thomas explained that he wanted him to witness his will, and that Mr. Babcock had drawn it for him. Mr. Thomas signed it and then the witness and Mr. Babcock signed it. Mr. Thomas requested that he sign it. Then Mr. Babcock put the old will into the stove and burned it up.

C. M. Davis testified that he saw W. O. Thomas at Beck's store on June 20, 1901, and talked to him,

and he said he was born the same year as Queen Victoria and had lived longer than she did.

James E. Cowan testified that he saw Mr. Thomas about March 8, 1901; renewed a policy of insurance for him; he called at witness's office and paid premium; he complained at the rate being higher; the policy was changed to Thomas Thomas on March 27, 1901; my recollection is that both W. O. Thomas and Thomas Thomas came to my office about that date and asked to have the policy changed.

George L. Welsh testified that he knew Mr. Thomas for thirteen years; he owned seven houses; spoke to him the last time in February, 1901; transacted business with him; he paid my bill; he understood the work done and the reasonableness of the charges; never knew of his doing a foolish or irrational act; in the fall of 1900 witness made a mistake of a nickel or a dime in making change and he detected it.

Thomas Hughes testified that he knew Mr. Thomas for eighteen months before his death; witness lives in Granite City, Illinois; saw Mr. Thomas on St. Patrick's day, 1901, at his house, went to pay him ten dollars he had loaned me; he asked when I had heard from mother; Mr. Thomas did nothing that day that made me think he was not in his right mind.

Lizzie Hughes, daughter of last witness, testified that she lives in Granite City, Illinois; and went with her father to see Mr. Thomas on March 17, 1901; did not talk with Mr. Thomas; he was up, walking around and dressed; spent a week at his house; he went out to be shaved and to attend to his business; did not see him locked up; saw nothing to indicate that he was not in his right mind.

Thomas John Williams testified that he lived in Granite City, Illinois, met Mr. Thomas for the first time on March 17, 1901, at his house, spent the afternoon there; he asked me whose boy I was; did not recognize my father's right name but knew him by his

nickname; talked about Wales; he spoke about religion and the Good Templar's button I wear; he went to church with us, said he was going to give Tommie fifteen thousand dollars' worth of property, and ten thousand to Alma; that he was going to provide for the church.

W. R. Hallis testified that he was bookkeeper for Laclede Fire Brick Company, graduate of law and admitted to the bar; prepared a lease for Mr. Thomas in November, 1900, at the request of Tommie Thomas, lease was to Tommie to sink a shaft; he pointed out the property on a plat; stated terms and duration of lease. Saw nothing to indicate that Mr. Thomas was not in his right mind; Tommie paid me for my services.

W. H. Reynolds rented house from Mr. Thomas; did carpenter work for him for four or five years before his death; built three houses for him, the last one about the time his wife died; think last work done for him was repairing some steps in May, 1901; Daisy Thomas gave me the order; he paid for it; prior to that time he had not noticed that Mr. Thomas was unable to attend to business; never noticed that he was not in his right mind until ten days or two weeks before his death.

Thomas Morgens testified that he lived and was employed in the neighborhood of William O. Thomas, got to see him nearly every day and conversed with him as late as July, 1901. Thought he was a man of sound mind.

James H. Rhea testified that he was in charge of the safe deposit vaults, saw him frequently down at the safe deposit company, always unaccompanied except on two or three occasions, and conversed with him. He said Mr. Thomas was of sound mind.

Dr. J. H. Moore, an aurist, who treated Mr. Thomas for his defective hearing, saw him ten or twelve times during the two months prior to December 11, 1900. Mr. Thomas would come to his office down

town in the Century Building.  He always came un-accompanied.  Dr. Moore says Mr. Thomas was of sound mind.

Henry Roberts had a grocery store in the neighborhood and he was in charge of the church; he testified that he had known Mr. Thomas intimately for forty years; that he saw him at least once a week down to the date of his death; that he always attended church regularly until the last month or two before his death. Mr. Roberts occupied a lot leased from Mr. Thomas, and Mr. Roberts wanted to buy the lot.  At first Mr. Thomas asked $30 per foot, but later offered it to him at $25 a foot; Mr. Roberts did not buy the lot because that was more than he was willing to pay for it.  That was about eight months before Mr. Thomas's death. The witness also testified that Mr. Thomas was well able to take care of his affairs down to about a month or two before his death.  This witness also testified that in 1891—about ten years before Mr. Thomas's death—when the witness wanted to lease lot from Mr. Thomas, Mr. Thomas explained to him where the dividing line would be between the land which he would leave to Alma and that which he would leave to Tommie, and told the witness he could select the lot from the land which is to go to Alma or from the land going to Tommie, or both, and witness preferred to lease a lot which would go to Tommie.

J. W. Beck, of the H. W. Beck Feed & Seed Company, testified that they had been at 5701 Manchester avenue since they leased the property from Mr. Thomas in 1892, and he knew Mr. Thomas since that date.  He had nothing to do with the making of the leases; his father arranged that.  Witness said he got to see Mr. Thomas almost daily; he used to come to their office nearly every day; would converse with them, read the papers, etc.  They would converse about business, politics, religion or any matter that might be mentioned.  Witness always paid the rent to

Mr. Thomas in person and Mr. Thomas would give him the receipt. They paid the rent quarterly. He paid Mr. Thomas the March rent on March 7, 1901, and the check, which was produced and which bore only Mr. Thomas's indorsement, showed that he must have cashed it down town at the bank.

On June 4th, witness learned that Mr. Thomas was laid up and he called on Mr. Thomas and paid him the June rent and Mr. Thomas (who was lying in the bed at the time) said he would send him the receipts.

Mr. Thomas frequently told him (even as late as March 7, 1901), what disposition he was going to make of his property. From the point (the end of the wedge) up to and including Roberts's place to Tommie; from there up to Schwenker's to Alma; and from Schwenker's up to the church to the grandchildren, and the Beck property to Mary.

Mr. Beck also testified that their rental was on the basis of about $2 per front foot per annum, and that this is about the same rental that other property in that neighborhood was paying. The rental under the renewal leases is higher.

Mr. Beck also testified that from the date of Mr. Thomas's death, in September, 1901, down to March 1, 1904, they paid the rents every quarter to Mrs. Jones for the property leased by them and which had been devised to Mrs. Jones by the last will of March 28, 1901. Thomas Thomas also testified that Mrs. Jones never offered to divide these rents with the other heirs but retained them as hers under the will.

Mr. Welsh also testified that this was the usual rental and that he was paying that for his property.

Alma Thomas testified that he knew nothing about the deeds of March 16th, or the will of March 28th, until the 8th or 9th of April, when the father gave him the deed, which had already been recorded, and from that day on Alma was permitted to collect the rents. His father had for years assisted him with money as

he needed it, and when he gave him the deed he advised him to take good care of it or he might some day go to the poorhouse. Alma visited his father regularly once or twice a week. In April during his spell of sickness, Alma remained with him at night for a couple of weeks, commencing April 1st, but there never was a time when his father was not perfectly rational or was unable to understand fully what he was doing.

Daisy Thomas, a granddaughter of the deceased son John, testified that she went to live with her grandparents about 1897—about four years before her grandfather's death. She went there to help the old folks—run errands, etc., she was about twelve years old. She continued at school for about two years while with them; after the old lady's death she continued at the house, helping her grandfather until his death, and she remained there a month or two longer and then returned to her mother's home. At first her grandfather paid her $4, then $6, and later $8, per month for her services. There was no agreement about it, but he paid her punctually on a day certain, just as if he were paying her wages. After the grandmother's death her grandfather got Tommie and his family to come over and keep house for them and he paid them board for himself and Daisy, $6 a week for both of them. This he also paid punctually every week. Her grandfather had some eighteen or twenty tenants besides the Beck Feed Co. lessee. The Beck rents he always got himself; the rent from the other tenants would sometimes be brought to the house, sometimes he would go and sometimes he would send her to collect, and if he sent her she would turn it over to him, and either he or she, at his direction, would sign the receipts. He kept the accounts in a book; he looked after and took care of the property. He gave orders for the repairs when necessary; he paid the bills; and he would take his surplus money down town to his safe deposit box. He was punctual about the col-

lections and the payment of his bills, and understood as well as anybody the counting of money and the value of money. He was also the church treasurer and received all moneys and paid all bills and kept the accounts in a book. He held this office until the end of February, 1901. He was also the bishop's collector and received the moneys contributed in his district and he paid them over to the bishop's agent. His own contribution on December 31, 1900, was $110. In the fall of 1900 he went with her to Iowa to attend a church conference. He attended church regularly down within a few weeks before his death and she usually went to church with him, but frequently he was ready before she was and he would go over to the church first and she would come later. He attended the church festival on the evening of February 22, 1901. She went along to church with the Granite City visitors on March 17, 1901. She went down town with him on April 18th, when he went to the safe deposit company, and then bought fruit for his birthday party which was to take place the next day. She was taken along to bring home the fruit. There was a birthday party the next day and many of his friends and Mrs. Thomas's friends were there and spent the afternoon in conversation with him—including the plaintiff and Mrs. Cook and Mrs. Remington. He attended a funeral in April, 1901. He hired the carriage and Mrs. Remington and Mrs. Cook went along with him. He was neat about his person, careful and tidy about his dress. She would lay out his things for him and he would dress himself. He would also buy all of his own clothing. He was clean-shaven and would regularly go out to get shaved. He would visit the neighbors every day, take a walk and attend to business in the neighborhood. He would go down town to the safe deposit company and other places, always

unaccompanied. He would read the daily newspapers every day, and was also a subscriber to several monthly papers—a Welsh paper and church papers. She would converse with him on any subject, the same as she would with others. He was always in his right mind and always knew how to conduct his own business, and always managed his own affairs until about a month before his death. During the last months he was delirious at times. He never had an attendant or anybody to watch him. During sick spells some one would be with him at night, once Mrs. Richard, once Alma, and at other times David James and Richard Hughes. He never was locked in and he was never violent. He never had delusions and never committed the irrational acts about which plaintiff's witnesses gave testimony, nor did he ever express a desire to marry her or anybody else, so far as she ever learned. Dr. Dixon called at the house only twice. Dr. Murphy was his regular physician. He always complained of a pain in his side. She saw Mr. Babcock there twice, once when he came in connection with those deeds, and once when he called with the will. She saw the will executed. Mr. Thomas then as well as on all other occasions was able to recognize everybody.

Mrs. Annie Thomas, the wife of Thomas Thomas, testified to many of the matters as to which Daisy testified and corroborated Daisy's testimony in all essential particulars. They were both of the household of the old gentleman from September, 1899, until his death. In addition to these matters she explained how they came to go over to the old gentleman to keep house for him after his wife's death. Daisy was only fourteen years old. They came over under an arrangement that the old gentleman would bear the expense of maintaining the house. He kept this up for a few months, until January, 1900, and then he wanted to change the arrangement and only pay board for himself and Daisy, and it was agreed that he should

pay $6 per week, $4 for himself and $2 for Daisy, and this he always paid down punctually to July, 1901. At that time he said: "Now, when they bring the rents in it worries me. You and Daisy—let Daisy go out and collect the rents that they don't bring in, you and Daisy attend to that part of it, and you keep everything paid up and don't accumulate any debts whatever." She was present when Mr. Babcock came out the first time in regard to the deeds, but she was not present when the deeds were signed up nor when the will was signed. She explained how they came to send for Mr. Babcock. The old gentleman was engaged in reading the newspaper and he asked for Tommie; Tommie was not in, and he had them send for him. When Tommie came he explained that he had just been reading an account of where some man had deeded his property to his son, and he wanted to do the same for him and Alma, and he told Tommie to go down and ask Mr. Babcock to call. There never was a time except during the last few weeks of his life when the old gentleman was not entirely rational. He never did any of the irrational acts attributed to him by plaintiff's witnesses, and he was at no time violent.

Thomas Thomas testified that his father sent for him. That he had seen in the newspaper where some man had turned over something like $100,000 to his son. The headline of the article was "Robbed the Court." He said, "I am going to deed to you and Alma what property is coming to you. The reason I do this is because your brother (meaning Alma) cannot live two years without anything." Mr. Thomas explained that he went down to Mr. Babcock and asked him to come out. Thomas Thomas testified; "Well, to the best of my knowledge he came out one day to find out what he wanted and then he came out the next day, I think. My father told me what he wanted Babcock for and I told him that." At any

rate, Babcock came to the house on March 15th. There was some mistake about the description; he came back the next day with the deeds, which the father signed—one to Alma and one to Thomas. The father also gave Mr. Babcock the old will, with direction to change it. Babcock came back on March 28th, with the new will drawn by him, and it was executed and attested by the witnesses. Then Mr. Babcock put the old will in the stove and it was burned up. When the deeds were executed the father gave them to Tommie, to be recorded. He recorded them on March 18th. The father continued to collect the rents from Thomas's property down to July, at which time he told Mrs. Thomas to collect the rents. Prior to July he had nothing to do with the collection of moneys for his father, with the ordering of repairs or payment of bills, payment of taxes or deposit of moneys. Although he had access to his safe deposit box, he was never at the box alone except in February, 1901, when his father sent him down to get that $400 in gold which he wished to divide amongst the children. And he was at the safe deposit company only once with his father and that was on March 27, 1901, when he went down with his father to have the insurance on the property transferred. He also explained how his father came to go to Dr. Dixon; that Dr. Murphy was his regular physician, and that Dr. Dixon saw him only on three occasions. That it was for years a matter of common knowledge in the family that the father intended to leave to the boys the property which he deeded to them in March, and that Mrs. Jones was to get the property which he devised to her by the will. The will of October, 1900, also so provided. When the old gentleman died he had $1,350 in cash laid by in his safe deposit box. The property leased to the Becks had been in the possession of Mrs. Jones and her husband for thirty years, and it never realized a dollar of income for her father. He even paid

the taxes on it himself. He succeeded in leasing it to the Becks and figures that this property paid him better net rent than any of his other property.

Plaintiff's expert, R. H. Cornell, testified that Mrs. Jones's property was worth $4,527; defendants' expert, Albert J. Aiple, testified that it was worth $5,040. Plaintiff's expert testified that the property deeded to Thomas and Alma was worth $21,600 and improvements $10,700; total, $32,300 (he did not state separately the value of each parcel). Defendants' expert testified that Tommie's was worth $12,496 and Alma's $8,675—together $21,171.

Joseph Winkle knew Mr. Thomas since 1874; saw him last June, 1901; after his wife's death; talked to him about his own ailments and family affairs, and his wife; never observed anything irrational about him.

Thomas L. Mitchell knew Mr. Thomas for twenty to twenty-five years; had a neighborly and ordinary speaking acquaintance with him; would speak to him about once a week as he passed my place or I met him on the street; spoke of the weather or current events, nothing of a prolonged nature; may not have seen him for four, six or eight months before his death; never noticed anything irrational about him; as far as I know his mental condition was normal.

## Rebuttal.

Patience C. Remington testified that the funeral of Marcy V. Mullino was in April, 1901; Mr. Thomas did not go with me, my mother and Mrs. Cook; he went to John Hancock's funeral in September, 1900; Mr. Thomas did not collect the bishop's money in the church; my husband did so; Daisy told me a policeman had to help her put Mr. Thomas on the car at the Sarah street junction; Daisy told me in 1900 and in 1901, that Mr. Thomas wanted to marry her; Daisy told me in the spring of 1901 that Tom Morgens

brought the old man off the road at six o'clock in the morning; Daisy told me in the spring of 1901 that he would get out and run away even when they had so many things against the screen door; Daisy told me in the spring of 1901, on several occasions, that "Grandpa must understand we are boss;" on New Year's eve, 1901, a party of boys went to Mr. Thomas's house and could not get in; Annie Thomas told me the next morning that the reason they didn't let them in was "because Grandpa was too sick for them to come in."

David James knew Mr. Thomas for twenty-six or twenty-seven years; was at his house in May; he did not know me; I went to take care of him on June 29, 1901; Tommie told me that Alma had taken care of him prior to that time, and it was too much work to sit up day and night; after I had been there a couple of nights I told Tommie he ought to get some one else to take care of him; that he slapped me and he was violent; he was violent sometimes; Tommie told me Mr. Thomas was conquered; I stayed until August; they paid me a dollar and a quarter a night; he was not out of the house while I was there on July 4, 1901, and I was there all the time except from five or six to ten or eleven o'clock in the morning; he tore up newspapers and thought they were greenbacks; kept them in his clothes; Tommie saw him doing it and took them from him; I had to make him some more to satisfy him; he stood before the mirror and preached, and when he got through he thanked me for my hospitality, said I was the man he was staying with, and thought he was a missionary.

Mrs. Mary Jones testified: My husband and I did not live on Mr. Thomas's property for thirty years without paying rent; we had let him have a thousand dollars, and when I wanted to buy the lot and build a house, he said he would build the house out of the money he owed us and would use what was left over to

apply on the land; the first payment on the land was five hundred dollars, and my money paid for building the house.

Mrs. Eleanor Richard: Daisy told Mrs. Remington that when she took Mr. Thomas down town he became so violent that she had to get a policeman to help her to get him on the car.

John Jones: On New Year's eve, 1901, quite a number of boys went to Mr. Thomas's house, and Tommie came out and told them they could not see the old man, "that he was too bad to be seen."

W. P. Doran: Babcock told me, when I went to see him about why the leases and deeds were made, that he could not reason with Mr. Thomas, and when I asked him why he could not do so he stated "that the old man was childish."

Chris Grieber rented from Mr. Thomas; for the last years Tommie wrote the receipts for the rent.

Over the objection and exception of the plaintiff the trial court permitted the defendants to examine their witness, Henry Roberts, as to a conversation he had with W. O. Thomas and to statements made by the latter, in 1891, ten years before the deeds were made, in which Mr. Thomas told him what pieces of his property he intended leaving to his son Thomas Thomas and what pieces he intended leaving to his son Alma Thomas.

Upon this evidence the court, as before stated, found the issues for the defendants, and dismissed the plaintiff's bill; and she duly appealed.

### ASSIGNMENT OF ERRORS.

1. There is no evidence to support the judgment.

2. The finding and judgment of the trial court is against the evidence and the great weight of the evidence.

3. The judgment is against the law.

4.  All of the disinterested testimony in the case shows that the grantor was of unsound mind when the deeds were made, and was incapable of making a legal contract or of understanding what he was doing.

5.  The trial court erred in admitting incompetent evidence offered by defendants.

6.  The deeds were procured by the defendants by undue influence, and by taking advantage of the sickness, delusions, and mental incapacity of the grantor, W. O. Thomas.


## OPINION.

I.  The first insistence of counsel for appellant is, that there existed such a relation of trust and confidence between William O. Thomas and respondents at the time of the execution of the deeds in question as to shift the burden of proof from the former to the latter, which required them to show that the grantor was of sound mind, capable of making a deed, and that the deeds in question were made by him as his free act, uninfluenced by any improper conduct upon their part.

If this record disclosed the fact that such relation existed, then under an ancient and well-settled principle of the law of evidence the burden of proof would have shifted from appellant to respondents, as contended for by her counsel. [Ennis v. Burnham, 159 Mo. 1. c. 518; Martin v. Baker, 135 Mo. 1. c. 504; Kirschner v. Kirschner, 113 Mo. 1. c. 297.]

The only testimony relied upon which tends to establish that relation is that which shows the age and condition of the grantor, the unequal division of his property among his children, and the fact that he resided with his son Thomas from and after the death of his wife in the year 1899 down to the time of his own death. That alone is not sufficient. The evidence

should have gone further and should have shown that Thomas had charge and control of his father and that he cared for and administered unto his health, comfort, wants and necessities, or that he had charge of and conducted his father's business, or that some such relation existed between them, showing that the father actually reposed trust and confidence in his son. The bestowment of such love and kindness upon the father that a son owes to his parents is not sufficient evidence from which the court can draw the conclusion that such a confidential relation exists between them that the law will presume a conveyance made by the latter to the former was the result of fraud or undue influence. [Studybaker v. Cofield, 159 Mo. 596; Campbell v. Carlisle, 162 Mo. 634; Doherty v. Gilmore, 136 Mo. 414; Huffman v. Huffman, 217 Mo. 182.]

While it is true appellant testified that her brother, Thomas Thomas, one of the respondents, told her one day that he had charge of and managed his father's business, yet he squarely contradicts that testimony, and the evidence totally fails to show that he did have charge of or managed his father's business. So, we are of the opinion that the court correctly found that statement to be untrue.

And as to his son Alma, there is no claim whatever of the existence of any evidence which tends to show there was a confidential or trust relation whatever existing between him and his father.

We, therefore, hold that the evidence herein fails to show such a confidential relation existed between respondents and their father, William O. Thomas, at the time of the execution of the deeds in question from which the law will raise a presumption that the deeds were procured through the means of fraud or undue influence exercised over the mind and will of the grantor by the respondents; or that would justify the court in holding that the burden should shift from appellant to respondents to show that he was of sound

mind and that the deeds were executed without fraud or undue influence on their part.

II.   We now come to the consideration of the question, did William O. Thomas possess sufficient mental capacity to understand and know what he was doing when he executed the deeds in question?

While this court has never attempted to lay down a rule or prescribe a standard by which the mental capacity of a person to make a deed can be tested, yet at an early day in the history of our jurisprudence, the court did promulgate a rule by which the degree of mentality required to make a valid will must be tested. That rule is as follows: ''A disposing mind and memory may be said to be one which is capable of presenting to the testator all of his property, and all the persons who come reasonably within the range of his bounty, and if a person has sufficient understanding and intelligence to understand his ordinary business and to understand what disposition he is making of his property, then he has sufficient capacity to make a will.'' [Benoist v. Murrin, 58 Mo. l. c. 322.] That rule has never been questioned by this court, but it has met with universal approval whenever presented for consideration.

It is true, as contended by counsel for appellant, the law ordinarily requires a higher degree of mentality to execute a deed than it does to make a will. [Ennis v. Burnham, 159 Mo. l. c. 518; Kirschner v. Kirschner, 113 Mo. l. c. 297; Weston v. Hanson, 212 Mo. 248.]

The reason why the law makes that distinction is that in the case of a deed ordinarily the contract evidenced thereby is dual in character, operating in the exchange of values, which requires knowledge and judgment of properties, and the mental capacity to compete with the other party to the contract in the intellectual struggle that takes place in its negotiation

and consummation. This is not required in the same degree in the making of a will. The latter springs from love and affection, duty or philanthrophy, while the former is born of and based upon the love of gain. Contract may give rise to fraud, deception and undue influence, and for the circumvention of which a sound mind and mental activity are necessary, which is not so imperative in degree in the devisor who wishes to give his property away by will as it is in a grantor who wishes to sell his property for a valuable consideration.

The law in each case protects the weak mind from the strong; but in the case of a will no such conflicting interests or mental struggle takes place, as before suggested. The devisor in disposing of his property by will simply gives expression of his wishes in the premises, untrammeled and without opposition, and if he possesses sufficient mentality to do the things enumerated in the rule before stated, then he is as competent to make a will as if he possessed a Platonic intellect. But not so in case of a contract—he must be of sound mind, and possess sufficient mental strength to judge of values and successfully oppose fraud, deceit and undue influence whenever brought to bear upon him in the negotiation of a contract.

But in the case at bar that difference in the degree of intelligence required of a party in order to execute a valid deed and to make a valid will is of no practical importance, for the reason that the deeds in this case were not for the exchange of values within the ordinary meaning of conveyances of real estate but were intended as gifts of the land by the grantor to his sons in consideration of love and affection which is the basis of most wills. In other words, it requires no more mental strength on the part of the grantor to give his property to his children by deed than it does for a devisor to give it to them by will—both stand

upon the same foundation. [Chadwell v. Reed, 198 Mo. 359; Richardson v. Smart, 152 Mo. 623.]

A great many witnesses were examined upon this question by both appellant and respondents, who composed the members of the family of the interested parties, and many of their neighbors and business associates. If the testimony of appellant's witnesses is true, then William O. Thomas was a man not only of unsound mind but he was almost an imbecile, scarcely conscious of his own existence, and, of course, was not capable of making a valid deed. If upon the other hand the witnesses for respondents told the truth, then the grantor was perfectly sound in mind and fully comprehended and understood what he was doing when he executed the deeds. It would be difficult to perceive how the testimony could be more conflicting and contradictory.

Where the evidence introduced by the respective parties is contradictory and conflicting, this court has repeatedly held that since the circuit court has the witnesses before it, and the opportunity of observing their demeanor upon the witness stand and their manner of testifying, it is in a much better position to judge of the credibility of the witnesses and the weight to be given to their testimony than is this court. And in equity cases, where this court has the right to review and weigh anew the evidence, the usual practice is to defer largely to the findings of the trial court on all issues of fact, and will refuse to disturb the judgment of the trial court on the ground that the findings are against the weight of the evidence. [Brecker v. Fillingham, 209 Mo. 1. c. 583; Tinker v. Kier, 195 Mo. 183; Huffman v. Huffman, 217 Mo. 182.] This last case has drawn the rule much harder than any previous case to which my attention has been called, and in fact much stronger than I ever understood the rule to be, but as it has the support of the

Court in Banc, it must be accepted as binding authority in this case.

But independent of this rule, after a careful reading of this voluminous record, we are perfectly satisfied the trial court reached the proper conclusions as to the facts of the case.

We are satisfied that if William O. Thomas had been a man of such unsound mind or so near being an imbecile as several of appellant's witnesses would have us believe, then no intelligent observing man or woman could have failed to have noticed the condition of his mind, yet a majority of his kin, business associates and practically all of his neighbors testified that he was a man of strong will power, and was-of sound mind at the time he executed the deeds in question, and that he understood perfectly what he was doing at the time; and that they noticed nothing out of the ordinary or wrong with his mind until about ten days or two weeks just prior to his death. Witnesses who bear close family, social or business relations to the grantor in a deed possess the most favorable opportunities for observing and knowing his mental condition, and usually their testimony as to his mental condition and capacity is entitled to great weight. [Holton v. Cochran, 208 Mo. 314.] Surely it cannot be true that this large number of witnesses who saw and conversed with him every few days, and some of them every day, could have done so without having detected his unsound mental condition had he reached that stage of imbecility described by some four or five of appellant's witnesses. If he was of unsound mind, then they either failed to discover his true condition, or if they did, then they falsified regarding that matter. The great weight of the disinterested testimony was in favor of the respondents; and in our judgment, as before stated, the findings of the trial court are supported by the greater weight of the evidence.

In addition to this the law presumes William O. Thomas was of sound mind at the time he made the deeds, and the burden of disproving that fact rests upon the appellant, which she has wholly failed to do. [Chadwell v. Reed, 198 Mo. 359; Richardson v. Smart, 152 Mo. 623.]

III. It is next contended by counsel for appellant that the record in this case discloses the fact that the execution of the deeds by William O. Thomas to the respondents was procured by undue influence, exerted by them over the mind and will of the latter.

As to Alma, the evidence is uncontradicted that he did not know his father's intention to make the deeds, except as to some general expressions made by his father extending over a considerable period of time, until some days after the deed was executed and recorded. The first he knew of its existence was when his father handed it to him after it had been recorded.

While as to the execution of the other deed to his son Thomas, there is some evidence tending to show that it was procured by undue influence exercised over the mind of the grantor, yet that evidence, like that regarding the unsound condition of his father's mind, is outweighed and completely overcome by the other testimony in the case. If there had been no other testimony introduced contradicting and overcoming the testimony introduced by appellant touching that question, then the authorities cited and quoted from by her learned counsel would entitle her to a recovery; but, unfortunately for her, as before stated, her case is completely overthrown and destroyed by the greater weight of the evidence in the case.

We are also of the opinion that the finding of the trial court upon that issue was also for the right party.

IV. One of the grounds stated in the petition for having the deeds in question set aside is that they

were procured through fraud and deception perpetrated upon the grantor by the respondents. We suppose that claim has been abandoned by counsel for appellant as it was not urged upon our attention in brief or argument. However that may be, we have failed to discover any evidence whatever tending to show that either of the respondents was guilty of any fraud perpetrated in connection with the execution of the deeds.

V. It is next contended by appellant that the action of the trial court in admitting the testimony of the witness Roberts, as to a conversation he had with William O. Thomas as to a statement made by the latter in the year 1891, in which he told witness that he intended to give to respondents certain pieces of property, was erroneous. There were three or four other witnesses who testified to similar conversations had with him, but not extending as far back as the year 1891. In our judgment that testimony was proper, for the reason that it showed a fixed and definite purpose on the part of the grantor of long standing to convey this property to the respondents. [Teckenbrock v. McLaughlin, 209 Mo. 533; Thompson v. Ish, 99 Mo. l. c. 171.]

VI. It is finally insisted by counsel for appellant that the court below erred in excluding the testimony of certain witnesses as to certain alleged declarations of the grantor, tending to show improper acts and conduct on the part of his son Thomas, and of certain members of his family.

That testimony was admissible only for the purpose of showing the mental condition of the grantor and the state of his affections. All such declarations have no probative force to establish undue influence. [Teckenbrock v. McLaughlin, 209 Mo. 533; Crowson v. Crowson, 172 Mo. l. c. 702; Seibert v. Hatcher, 205 Mo. 83.]

Under these authorities that testimony was clearly admissible for the purposes above stated; but this being an equity case, this court may admit and consider all testimony preserved in the record which was improperly excluded by the trial court, and render here such judgment or decree as the court may deem just and proper under the pleadings and evidence.

In discussing this same question in the case of Gibbs v. Haughowout, 207 Mo. l. c. 391, this court said:

"This court has many times held that on appeal in equity cases it would consider evidence which was improperly excluded by the trial court, or reject evidence improperly admitted when preserved in the bill of exceptions without reversing the judgment for that reason. [State ex rel. v. Jarrott, 183 Mo. l. c. 218.] And it has also been uniformly held that in equity cases this court would on appeal proceed *de novo* to hear and determine the cause, deferring somewhat to the findings of the trial court; but if its findings and judgment were not sustained by the evidence and law, then this court would proceed to make its own finding and enter judgment as equity and justice might require. [Blount v. Spratt, 113 Mo. 48; Courtney v. Blackwell, 150 Mo. l. c. 267; State ex rel. v. Jarrott, 183 Mo. 204.] According to the doctrine announced in these cases, it is the duty of this court to exclude the evidence of Gibbs and to affirm the judgment, if it is for the right party.

"After excluding the testimony of Gibbs, we are still of the opinion that this court would not be justified in disturbing the judgment cancelling the deed in question."

By considering the excluded testimony the results reached by the circuit court would not and should not be altered, for the reason that it could not overcome the great weight of the evidence which preponderates in favor of the respondents.

Finding no reversible error in the record, we are of the opinion that the judgment should be affirmed. It is so ordered.

All concur.